# CRARY *v.* DYE.

ERROR TO THE SUPREME COURT OF THE TERRITORY OF NEW
MEXICO.

No. 103.  Argued January 13, 14, 1908.—Decided February 24, 1908.

The views of the territorial courts are very persuasive on this court as to
the construction of local statutes.

This court holds, following the construction by the Supreme Court of New
Mexico of the statutes of that Territory, that there is no authority in
New Mexico for the issuing of an alias writ of attachment, and that levy-
ing upon property under such a writ gives the court no jurisdiction there-
over, and the purchaser acquires no title through sale under such a levy.

One claiming to have been influenced by the declarations or conduct of
another in regard to expending money on real estate must, in order to
assert estoppel against that person, not only be destitute of knowledge
of the true state of the title, but also of any convenient and available
means of acquiring knowledge in regard thereto; where the condition of
the title to real property is known to both parties, or both have the same
means of ascertaining the truth, there can be no estoppel.

One whose mining property was sold under a void attachment *held* in this
case not to have been estopped from asserting his title to the property
as against the vendee from the purchaser at the sheriff's sale by reason
of statements made by him to such vendee prior to the final payment.

*Held* also in this case that the actions and declarations of the owner of a
mining claim sold under a void attachment did not amount to an aban-
donment of his claim so that he could not reassert his title to the property
as against the purchaser at the sale or his vendee.

78 Pac. Rep. 533, affirmed.

THE facts are stated in the opinion.

*Mr. H. B. Fergusson,* with whom *Mr. Elfego Baca* was on
the brief, for plaintiffs in error.

*Mr. W. B. Childers* for defendants in error.

MR. JUSTICE McKENNA delivered the opinion of the court.

This is an action of ejectment for certain mining ground in the
Territory of New Mexico. Plaintiffs in error claimed title by
virtue of a sheriff's sale in proceedings against Dye, one of the

defendants in error, reinforced by certain declarations of the latter, which, it is contended, constitute an estoppel against him to assert the invalidity of the sale or claim of title thereunto. There have been two trials of the action. The first resulted in a verdict for plaintiffs in error, which was reversed by the Supreme Court of the Territory. 78 Pac. Rep. 533. The second trial resulted in a judgment for defendants in error, which was affirmed by the Supreme Court. This writ of error was then sued out.

The validity of the sale and an estoppel, based on the facts hereinafter referred to, were relied on by plaintiffs in error at the first trial, and they secured a verdict by the instructions of the court. The Supreme Court of the Territory reversed it, adjudging the sale to be invalid on the ground that an alias attachment was not authorized by the laws of the Territory. 78 Pac. Rep. 533. On the second appeal the court refused to review this decision, holding it to be the "law of the case," and not open to further review. It confined its consideration to the question of estoppel and decided the question adversely to the contention of plaintiffs in error, and affirmed the judgment against them. This writ of error brings up both questions, which we will consider in their order:

1. The statutes of the Territory distinguish between original and ancillary attachments. Sections 2686 and 2721 of the Compiled Laws of New Mexico. There is no provision for an alias attachment, and it was hence concluded by the Supreme Court of the Territory that an alias attachment was not authorized, and that a judgment dependent thereon was void and could be attacked collaterally. The procedure in attachment is provided for in chapter II of the Compiled Laws of New Mexico, §§ 2686 to 2737, both inclusive. A summary of the applicable sections is inserted in the margin.[1]

---

[1] SEC. 2686. Creditors whose demands amount to $100 or more may sue their debtors in the District Court by attachment, when, among other cases, the debtor is not a resident of or does not reside in the Territory, or has concealed himself, or absconded, or absented himself from his usual place

There is no provision for an alias attachment, and we think the implication of the statute is against it, certainly against it except upon filing a new affidavit and bond and a new publi-

of abode, "so that the ordinary process of the law cannot be passed upon him."

SEC. 2690. A creditor wishing to sue his debtor by attachment may place in the clerk's office a petition or other "lawful statements" of his cause of action and file an affidavit and bond, and thereupon he "may sue out an original attachment" against the property of the debtor.

SEC. 2691. An affidavit must be made by the plaintiff, or by some person for him, stating that the defendant is indebted to plaintiff and the amount of the indebtedness and on what account, and the existence of one or more of the causes mentioned in section 2686.

SECS. 2692, 2694. A bond shall be executed by the plaintiff, the penalty of which and the sufficiency of the sureties shall be approved by the clerk, and shall be conditioned that the plaintiff shall prosecute the action without delay, and with effect, and, to quote from the statute "refund of sums of money that may be adjudged to be refunded to the defendant or garnishee by reason of *this attachment,* or any process of judgment thereon." The clerk is directed to indorse his approval on the bond "and the same, together with the affidavit and petition or other lawful statement of the cause of action, shall be filed before an attachment shall be issued."

SECS. 2696, 2697. Original writs of attachment shall be directed to the sheriff of the proper county, commanding him to execute the same, "with a clause of the nature and to the effect of an ordinary citation, to answer the action of the plaintiff." And shall be issued and returned in like manner as ordinary writs of citation, and when the defendant is cited to answer the action the like proceedings shall be had between him and the plaintiff as in ordinary actions or contracts, and a general judgment may be rendered for or against the defendant.

SEC. 2701. When the defendant cannot be cited and his property and effects shall be attached, if he do not appear and answer to the action at the return term of the writ, within the first two days thereof, the court shall order a publication to be made, stating the amount of the plaintiff's demand and notifying him that his property has been attached, and that unless he appear at the next term judgment will be rendered against him and his property sold to satisfy the same. Publication in a newspaper is directed.

Section 2702 enlarges section 2701, and provides that the law of the Territory in regard to attachments is so amended that where the defendant cannot personally be served with the process and shall have no place of residence in the Territory, and the property of the defendant shall have been attached in time to make the necessary publication as now required by law, the officer executing the process, or the agent or attorney of the plaintiff in the case, is authorized to make publication of notice to the de-

cation of notice.  We have seen that an affidavit and bond are
required and the proceedings are that when a defendant can-
not be cited and his property shall be attached, if he did not
appear within the first two days of the return term of the writ
the court shall order publication to be made stating the amount
of the demand, that his property has been attached and that
unless he appears at the next term judgment will be rendered
against him and his property (property attached, § 2703) sold
to satisfy the same.  In other words, the attachment must
precede the publication and constitutes the ground of publi-
cation.  The summons to the defendant is through his property
and does not extend beyond it.  The only consequence of his
default is the sale of the property attached—not some other
property or property attached subsequently to publication.
The publication cannot be ordered until the execution of the
writ of attachment and its return.  Section 2701.  And to the
same effect, as we have seen, in § 2702.

It is, however, contended by plaintiffs in error that subsec-
tion 24 of § 2685 prescribed the procedure of publication of
summons, not §§ 2701, 2702, and that subsection 24 provides
that upon filing a sworn pleading or affidavit showing cause for

fendant in such attachment in the manner prescribed by law, which shall
have the same force and effect to compel the appearance of the defendant
as if such publication had been in conformity to an order of the court, and
upon proof of the publication being made to the court plaintiff may proceed
in the case as if the process had been served personally upon the defendant.

SEC. 2703.  Judgment by default may be entered, but the judgment shall
only bind the property attached.

SEC. 2707.  A defendant may contest the truth of the affidavit, and if he
succeeds the action is dismissed.

SECS. 2713, 2714, 2715.  Where the debt exceeds the sum of $100 the
creditor has an election of suing out the attachment, either from the dis-
trict court or from the probate court of the county in which the suit is
brought, by filing affidavit and bond with the clerk of such court.  The
form of the affidavit and bond is given, and it is required in its condition
to recite "that, whereas the above-named A. B. has this day sued out an
attachment," etc.  Ancillary attachments are provided for in section 2721,
and may be issued in a pending suit "when the summons against the de-
fendant has been returned Executed."

publication the clerk shall give notice of the pendency of the action in some newspaper published in the county where the action is pending, which notice shall contain the names of the parties to the cause, the court in which it is pending and a statement of the general objects of the action, and shall notify the defendant that unless he enters his appearance before the day named therein judgment will be rendered against him by default. If this contention be true it is difficult to account for §§ 2701, 2702, and the scheme provided for the commencement of actions by attachment. Nor do we think the contention is supported by the fact that by subsection 175 of § 2685 it is provided that the act "shall not affect actions of replevin or writs of attachment, except as to the form of action," and the amendment subsequently made excepting from the operation of § 2685, "proceedings by attachment." The amendment was made, no doubt, to put the meaning of § 175 beyond any controversy. Besides, subsection 179 provides that "the former practice in law and equity shall be retained in all cases and proceedings not comprehended within the terms and intention of this code."

But even if plaintiffs in error be right about subsection 24, an alias attachment would not thereby be justified. The Supreme Court of the Territory has expressly decided that an alias attachment is not authorized, and we have recently decided that the views of the local courts are very persuasive of the construction of the local statutes.

In the pending cause a petition in the attachment suit was filed in the District Court of the county of Lincoln on the fifth of March, 1898, and on the same day an affidavit was filed stating that the defendant could not be served "in the ordinary way or in any way except by publication." A writ of attachment was issued on the eighth of March. The sheriff made his return thereon on the sixteenth, certifying that he had levied upon and attached certain real estate, which was described, and "that the defendant, Benjamin H. Dye, is not in my county and supposed to be in the State of Ohio."

The record shows an alias attachment issued on the eleventh of May, 1898. The return of the sheriff shows that the alias writ came to his hands on the twenty-seventh of May, and that he levied the same on the twenty-eighth of May, on the mining claim now in controversy.

The first publication of the notice was on the seventeenth of March, 1898, and the last on the fourteenth of April, 1898. Pasted to the affidavit stating those facts is a paper headed "Notice of Suit," by which Benjamin H. Dye is notified "that a suit of assumpsit by attachment has been commenced against him," and that unless he enter his appearance on the fourth of June, 1898, judgment would be rendered against him in said cause by default. The record contains no other publication or notice, but it leaves no doubt that it was upon that publication the default of the defendant was based. This is established by the motion for judgment, filed by the attorney in the case, which alleges service by publication and that the appearance day was June 4, 1898. This motion was filed August 19, 1898, but proof of publication was not filed until December 31, the day judgment was taken. The judgment recites that the cause coming on to be heard, "it is considered that the defendant is in default for failure to answer, and, therefore, the court hears the evidence of plaintiff and assesses the damages on the two causes of action contained in the complaint at $143. And the court finds that the grounds of attachment are well taken and true in effect, and the defendant, having failed to deny same, it is ordered by the court, considered and adjudged that the attachment herein be sustained."

The record shows only one affidavit and bond, but it is contended by plaintiffs in error that even if it be considered necessary that another affidavit and bond should have been filed to justify the alias writ it must be presumed that they were filed in the absence of evidence to the contrary; that the mere silence of the record is sufficient. To support the contention *Voorhees* v. *United States Bank*, 10 Pet. 449, and *Cooper* v. *Reynolds*, 10 Wall. 308, are cited. But if a presumption may

be entertained as to another affidavit and bond a presumption cannot be entertained that another publication succeeded the alias attachment. The record shows the reverse. The publication was complete before the alias attachment was issued, and, therefore, the attachment referred to in the notice was the first attachment, not the alias attachment. As we have said, the attachment must precede the publication. The attachment virtually commences the action, the publication is the summons to the defendant, giving the court jurisdiction to apply the property attached to the satisfaction of the plaintiffs' demand. It follows, therefore, that the court had no jurisdiction to render the judgment relied on and that the plaintiffs in error acquired no title through sale under it.

2. The principle of estoppel is well settled. It precludes a person from denying what he has said or the implication from his silence or conduct upon which another has acted. There must, however, be some intended deception in the conduct or declarations, or such gross negligence as to amount to constructive fraud. Brant v. Virginia Coal & Iron Co., 93 U. S. 326; Hobbs v. McLean, 117 U. S. 567. And in respect to the title of real property the party claiming to have been influenced by the conduct or declarations must have not only been destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring knowledge. Where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel. Brant v. Virginia Coal & Iron Co., supra. These principles are expressed and illustrated by cases in the various text books upon equitable rights and remedies. Does the conduct relied upon in the case at bar satisfy these principles?

The property was sold by the sheriff February 18, 1899, to Jones Taliaferro. On June 5, 1900, he leased the property to H. C. Crary and E. Heiniman, giving them an option to purchase. They went into possession and discovered by their labor upon the property a vein of rich gold-bearng ore in June

and later in August. They subsequently purchased the property under their contract, paying therefor the sum of $1,500. Dye returned to the Territory in the latter part of April, 1899, but took no steps to ascertain the condition of the attachment proceedings—indeed assumed or believed them to be valid, for he declared to several persons that his interest in the property had gone to pay a debt and that he considered it well sold. One of the persons to whom he made the declarations communicated them to Crary and Heiniman. And on the twenty-fifth of October, Mr. Heiniman testified that Dye visited the mine, "and while there, in the presence of Mr. Alexander and Mr. Crary, I told him that I was about to make the payment for the property in full, and I asked him if he knew of any conflicting claim or any other claims on the Compromise. He immediately answered there was. The Scranton claim on the west took off one hundred feet, and he said as to other claims there would be nobody but myself. And he says I have allowed all my time to lapse and I have no claim whatever. With that he wished me success, and hoped that it would prove to be a good mine. He says if it does, it is bound to benefit me, because I own an interest in the Little Nell claim, just north of you, which is only 155 feet north of the Compromise shaft."

To these statements the witness said he expressed his gratification that all were working "in harmony in the camp," and that Dye remarked further: "I wish you the best. I hope you will make a million." And he testified that if Dye had told him not to make payment under his contract, or that he was going to try to recover the mine, the witness would not have made the payment. And further, he first learned of Dye's intention to make a claim by the service in the suit of the papers by the sheriff, and that Dye had not in any of his visits intimated that he had a claim against the mine, or of his intention to assert a claim or give warning of any suit. "He always expressed himself, while visiting the mine, that it was one of the brightest prospects in the camp and that he was glad" that witness was one of the owners. Crary also testified

to conversations with Dye, the first being a few days after ore was "struck" in the mine, although witness had seen Dye frequently and Dye knew witness was working the mine. This conversation need not be given at length. It took place while witness was showing Dye the mine and the work which had been done preceding the discovery of ore. Dye said that he had owned the property, knew of the ore in the mouth of an old tunnel, "and had taken ore out of it, but did not regard it of sufficient value to warrant working it; that he had allowed his time to expire," and hoped that witness and Heiniman would do well on it; "that he made no claim to it, as he owned the property on the other side of the gulch; and if they could get good ore there it would make his Little Nell property more valuable." And the witness said: "I felt elated over the discovery of this ore, and both of us talked a good deal and both of us felt good." In corroboration of Heiniman the witness testified:

"Mr. Dye was there, and Mr. Heiniman asked him, I can hardly remember the exact words, but in substance whether the title to this property, the Compromise mine, was all right. Mr. Dye replied that there was some drawn ground between it and the Scranton, and it on the side that would belong to the Scranton. It was an overlap; that there could be no other claimant, unless it was him, and he had allowed his time to lapse and made no further claims to the property. He also added, 'I hope you will do well with the property, and make lots of money out of it.'"

He further testified that he did not think he would have completed the payment for the property if he had learned at that time that Mr. Dye expected to assert any claim to it, and further; "We done the work, and paid the payment on the repeated assurance of Mr. Dye that he made no claim to it, and would not have touched the property in the first place had we known that he made a claim or had a claim." The conversation between Dye and Heiniman has some corroboration from one of the employés of the mine who was working nearby.

It is manifest that Dye took for granted that the attachment
proceedings were good and, indeed, declared it—declared it be-
fore the discovery of gold on the claim—declared it afterwards
when he knew that Crary and Heiniman were expending con-
siderable sums of money upon the claim and had money yet
to pay upon it. Such declarations were natural enough before
the discovery of gold; they were not natural after the discovery
of gold—a discovery which apparently proclaimed the mine to
be one of great richness. Let it be conceded, therefore, that
his inattention to his rights was grossly negligent; that his ad-
missions of their loss were grossly negligent, and so far might
satisfy one of the conditions of estoppel. But another, and
the consummating condition, is that Crary and Heiniman must
have been without equal means of information. This, how-
ever, was not their situation. They had means of information
equal to those of Dye, and nothing was purposely done or said
to divert them from inquiry. The only source of information
was the record, and that they had examined and took legal ad-
vice upon its sufficiency. They testify, however, that they
also relied upon the declarations of Dye, as well as the advice
received, and that they would not have expended what they
had expended (four or five thousand dollars) or made the final
payment ($1,500) but for those declarations. The letter of
this testimony must be weighed against other considerations.
The declarations of Dye were but the expression of an opinion
of the legal effect of the attachment proceedings, made strong,
perhaps, from the right he had to attack the proceedings di-
rectly, but it is hard to think Dye's declarations were as de-
terminative as other considerations.

The lease and option to purchase the mine were not induced
by anything done or said by Dye. In taking them Heiniman
and Crary acted upon their own judgment, based upon the
prospects or chance of value, and their judgment was luckily
or skillfully exercised. Within a few days ore was discovered.
In the latter part of August the "big strike" was made that
demonstrated the mine to be of great value. This value must

be considered in estimating the relative strength of the inducements upon which Crary and Heiniman acted. When they took the lease and option to purchase the mine it was considered by Dye as worth no more than his debt to Taliaferro, to wit, $112 and the costs of the attachment suit. Taliaferro would have been glad to have taken $500 for it, Heiniman testified. At the time this suit was brought, December, 1900, six months after the lease, it was worth $100,000, according to Heiniman's testimony; $50,000 or $60,000 according to other estimates. This value they might acquire by the payment of $1,500. They would certainly lose it if they did not make such payment. The case, therefore, is very simple. It is a case of mining property bought upon speculation and title to which came through a sheriff's sale, the validity of which sale was either assumed or risked; the development of the mine undertaken in like speculation, but continued in certainty of reward within three days by the discovery of what Heiniman calls in his testimony "the large ore—the pay ore chute." Whether this was the real discovery or that of August following which finally revealed the richness of the mine, matters not. Within a few days there was evidence of value and inducements to the expenditures testified to. Within four months a property which was sold for a few hundred dollars was estimated by mining experts to be worth $100,000. Such inducement existing for Heiniman and Crary to complete their contract, we are asked to believe that they were misled by the declarations of Dye to action detrimental to their interest. We are unable to yield to the contention. That they felt satisfaction at the declarations may be. That they labored an extra day or spent an extra dollar upon the faith of them the record fails to establish.

Another contention remains to be noticed. Dye owned five-sixths of the mine; the other one-sixth was owned by the Apex Gold Mining Company. Dye did not do the assessment work upon the mine for 1898, and the work was done by the mining company. There was an attempt at forfeiture of Dye's interest, but the notice of publication was not given by the mining com-

pany but by one T. C. Johns, who described himself as coöwner with Dye. Johns was the manager of the company. Subsequently Taliaferro paid to one T. R. Walsh for Johns Dye's proportion of the expenditure for the work. Dye did not do or offer to do any assessment work for 1898.

Upon these facts plaintiff in error seemed to have contended in the Supreme Court of the Territory that Dye had forfeited his rights to Johns, considered as coöwner with Dye, and that Taliaferro by paying Johns became substituted to his rights. To this contention the Supreme Court made answer that a forfeiture had not been effected, because Johns was not a co-owner with Dye, but that the Apex Mining Company was, and that the company had not given notice of forfeiture. Plaintiffs in error now change their contention or the form of it. They now contend that after Taliaferro purchased the property at sheriff's sale, and before the forfeiture occurred under the advertisement against Dye by his co-tenant Taliaferro paid to the coöwner or its agent the amount claimed, and thereby protected himself under § 3126 [1] of the Compiled Laws of New Mexico, 1897, and ended also Dye's interest. But this contention involves again the validity of the sheriff's sale and the attitude of Dye to the sale. Besides, the liability for the assessment work had not taken the form of a lien.

It is further contended that an undivided interest in a mining claim can be abandoned, and that Dye's acquiescence in the sheriff's sale constituted an abandonment of the claim and an election to accept the sale as a disposition of his property. We do not concur in the view that Dye's acts constituted an abandonment of his claim.

*Judgment affirmed.*

---

[1] When any property shall be sold subject to liens and encumbrances, the purchaser may pay the liens and encumbrances and hold the property discharged from all claims of the defendant in execution; but the defendant may redeem the property within one year after the sale thereof, paying to the purchaser, his heirs or assigns, the purchase money with interest. When redeemed, the purchaser shall have the growing crops and shall not be responsible for rents and profits, but he shall account for wastes.