565 F.2d 1194
 Abdallah W. TAMARI, Ludwig W. Tamari and Farah W. Tamari,
co-partners doing business as Wahbe Tamari & Sons
Co., Plaintiffs-Appellants,
v.
BACHE & CO. (LEBANON) S. A. L., a Lebanese Corporation,
Bache & Co. Incorporated, a Delaware Corporation,
and the Board of Trade of the City of
Chicago, an Illinois
Corporation,
Defendants-
Appellees.
 No. 76-1728.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 25, 1977.
Decided Oct. 19, 1977.
Rehearing and Rehearing Denied Nov. 28, 1977.
 
 Donald C. Shine, Chicago, Ill., for plaintiffs-appellants.
 N. A. Giambalvo, Philip F. Johnson, Chicago, Ill., for defendants-appellees.
 Before SWYGERT and WOOD, Circuit Judges, and CHRISTENSEN, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 This is the second in a series of four cases growing out of the same transactions brought by plaintiffs, a Lebanese partnership and its partners (hereinafter "Tamari"), principally against Bache & Co., Incorporated, a Delaware corporation, now Bache Halsey Stuart, Inc. (hereinafter "Bache"), in an effort to obtain declaratory relief for alleged fraud in violation of the Commodity Exchange Act, 7 U.S.C. § 1, et seq.[1] Service was not secured upon Bache & Co. (Lebanon) S.A.L., a Lebanese corporation.
 
 
 2
 The present or second case is an appeal from the order of the district court entered on May 19, 1976, dismissing plaintiff's one count complaint on the ground that the complaint failed to state a claim upon which relief could be granted. The complaint seeking declaratory and injunctive relief under the Commodity Exchange Act, as amended, 7 U.S.C. § 1, et seq., and 28 U.S.C. § 2201, prayed for the termination of the arbitration proceeding then in progress between Tamari and Bache being conducted by the Chicago Board of Trade (hereinafter CBOT). The complaint alleged in general the existence of a dispute between Tamari and Bache, Tamari's establishment of commodity futures trading accounts with Bache, trading in those accounts and monies paid and allegedly owing to Tamari as a result of the trading. The grounds alleged for the relief sought were summarized by Tamari as follows: Tamari's agreement to participate in arbitration was induced by fraud and coercion which rendered the arbitration agreement invalid; Section 5a(11) of the Commodity Exchange Act, 7 U.S.C. § 7a(11), which became effective on April 21, 1975, applied and operated to bar arbitration; and there were infirmities which arose out of the arbitration proceedings themselves. We do not, however, read Tamari's complaint as alleging that the "agreement" to arbitrate contained in the original total agreement was specifically induced by fraud and coercion as distinguished from the contract generally. What is alleged in addition to fraud relating to the total agreement generally is that the "submission" of the dispute to arbitration was caused by fraud; that Tamari did not "voluntarily submit" to the jurisdiction of the CBOT; and that "participation" in the arbitration was coerced. These conclusionary and general allegations read together appear to us to refer primarily to events occurring after the original agreements containing the arbitration clauses were entered into.
 
 
 3
 Preceding the district court's order of dismissal the court entered on April 21, 1976, what was captioned a "Preliminary Opinion." In that opinion the court concluded that Tamari and Bache had entered into a valid arbitration agreement covering the underlying dispute; that the Federal Arbitration Act applied and that under Sections 3 and 4 of that Act, 9 U.S.C. §§ 3-4,[2] the case should be stayed as to Bache (Lebanon), dismissed as to Bache and CBOT, and Tamari ordered to arbitrate; that Section 5a(11) of the Commodity Exchange Act, 7 U.S.C. § 7a(11), did not apply to the case, since the savings provision of that Act, 7 U.S.C. § 4a, note,[3] precluded its application; and that Tamari's other claims were premature and could only be raised after completion of arbitration pursuant to Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10.[4] That preliminary opinion was entered jointly in both the first case and in this case. Against that background the district court's subsequent sua sponte dismissal of the complaint in this case upon the ground that it failed to state a claim upon which relief could be granted must be interpreted. Plaintiff argues that the factual assumptions made by the court in the preliminary opinion, principally that there was a valid agreement to arbitrate, denote the dismissal a grant of summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Plaintiff's position is that certain material factual assumptions made by the court have no proper foundation in the record and are in dispute. Therefore, plaintiff argues the court's subsequent order was the improper entry of summary judgment. Were we to view the order as granting summary judgment we would agree with plaintiffs, but we perceive the order instead to be a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure which provides for dismissal upon motion for failure to state a claim upon which relief can be granted, the exact language used by the court in its dismissal order. The defendants had filed no motions seeking relief in either form. The court was not however precluded, although it generally may be considered hazardous, from entering the order of dismissal on its own motion provided that sufficient basis for the court's action was otherwise apparent from the plaintiff's pleadings. For the purpose of testing the trial court's action, well pleaded allegations of the complaint are to be taken as admitted, but mere unsupported conclusions of fact or mixed fact and law are not admitted. Hess v. Petrillo, 259 F.2d 735 (7th Cir. 1958), cert. denied, 359 U.S. 954, 79 S.Ct. 743, 3 L.Ed.2d 761; Homan Manufacturing Co. v. Russo, 233 F.2d 547 (7th Cir. 1956). Since the relief sought was declaratory, that becomes another critical ingredient to be considered in judging the propriety of the dismissal. It has long been established that the grant of declaratory relief is discretionary. The appellate court may substitute its own judgment for that of the trial court if the trial court's exercise of that discretion is considered erroneous. Brillhart v. Excess Ins. Co., 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942); Sears, Roebuck & Co. v. American Mutual Liability Ins. Co., 372 F.2d 435 (7th Cir. 1967); Cunningham Brothers Inc. v. Bail, 407 F.2d 1165 (7th Cir. 1969), cert. denied, 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745.
 
 
 4
 The specific issues argued by Tamari are these:
 
 
 5
 1) What is the effect, if any, of Sec. 5a(11) of the Commodity Exchange Act, 7 U.S.C. § 7a(11) as amended, as applied to the arbitration proceedings in this case.
 
 
 6
 2) Was the CBOT estopped from arbitrating the underlying dispute.
 
 
 7
 3) Is there a factual basis for the district court's finding of a valid agreement to arbitrate.
 
 
 8
 4) Was there a procedural due process violation in the district court's dismissal.
 
 
 9
 5) Did the district court err in not finding a conflict of interest within CBOT affecting the arbitration proceeding.
 
 
 10
 6) Does Section 10 of the Federal Arbitration Act preclude the district court's consideration of allegations of misconduct by the arbitrators during the arbitration proceedings.
 
 I.
 
 11
 The preliminary opinion of the district court directed that the arbitration proceedings continue, but Tamari argues that Section 7a(11) prohibited the CBOT from conducting the arbitration. The district court relied on Section 4a, note, the savings provisions, providing that pending arbitration proceedings were not to be abated by the Section 5a(11) amendment. Tamari interprets the act as prohibiting arbitration of claims in excess of $15,000.00, and since the claims of Bache and counterclaim of Tamari each exceeds that limitation, Tamari argues the controversy could no longer be arbitrated. Tamari also leans heavily on Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), a securities case, as analogous federal authority supporting the application of Section 7a(11) to this case to prevent arbitration. In Wilko the court held that an agreement for arbitration of any controversy that might arise in the future between the parties was void under Section 14 of the Securities Act of 1933 notwithstanding the provisions of the Arbitration Act Section 14 of the Securities Act[5] provides that "any condition, stipulation, or provision binding any person acquiring a security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void." The Wilko arbitration agreement was held, considering Congressional policy, to be a stipulation waiving the benefits of the Security Act and therefore void. Two justices dissented, refusing to find that the Section 14 anti-waiver provision was a general limitation on the Arbitration Act. The Commodity Exchange Act, however, has no provision comparable to Section 14 of the Securities Act of 1933. Tamari similarly cites Danford v. Schwabacher, 342 F.Supp. 65 (N.D. Calif. 1972), appeal dismissed, 488 F.2d 454 (9th Cir. 1974), and Laupheimer v. McDonnell & Co., Inc., 500 F.2d 21 (2d Cir. 1974), both securities cases. Danford and Laupheimer are cases in which the respective plaintiff each claimed to have been induced by fraud to become a partner or officer in brokerage firms in order for the firms to gain control over the customer account of each. Both firms were in financial difficulty and by joining the firms each plaintiff found himself thereby subject to arbitration agreements. Both cases refused to enforce the arbitration agreements in the subsequent disputes, but both cases turned on Wilko's interpretation of the Securities Act of 1933 with its Section 14 waiver provision with which we are not faced. The Securities Exchange Act of 1934 likewise contains a similar waiver provision 15 U.S.C. § 78cc(a).
 
 
 12
 No judicial interpretation has been cited or found interpreting Section 7a(11) in similar circumstances, except an interlocutory Memorandum and Order of the United States District Court for the Northern District of California in Milani v. ContiCommodity Service, entered October 26, 1976, Comm.Fut.L.Rep. (CCH) P 20,227 and cited by Tamari.[6] However, we read that order as taking the view that Section 7a(11) does not prohibit compulsory arbitration agreements over and above or in addition to the arbitration requirements of the Act. Milani does, however, extend the Wilko rationale to commodities cases by holding that an agreement to arbitrate future commodity disputes is not enforceable. The Tamari complaint does not allege that particular deficiency, although it is argued. In any event we decline to legislate a Section 14 provision into the Commodities Act.
 
 
 13
 Bache does not read Section 7a(11) as prohibiting contract markets[7] from providing such other arbitration facilities as they may see fit and as may be agreed to in addition to what the act mandates. Such is also the view of the Commodity Futures Trading Commission.[8] Bache also relies on the Commission's view that Section 7a(11) does not preclude arbitration of customer claims in amounts in excess of $15,000,[9] and that arbitration proceedings on April 21, 1975, the effective date of the amendment, are not abated by Section 7a(11).[10] The administering agency's statutory construction is entitled to great deference, but independently we would have reached the same conclusion. Kupiec v. Republic Federal Savings & Loan Association, 512 F.2d 147 (7th Cir. 1975). In our view, for the reasons urged by Bache, Section 7a(11) is not applicable in any way, but even if it were, we view the proceedings as having been pending on April 21, 1975, and thus subject to the broad saving provision, Section 4a, note, as the district court held. Tamari alleges that on or about February 4, 1974, the dispute arose and was docketed with the CBOT Arbitration Committee prior to the date of the amendment. Thereafter, Tamari filed its own claim in the proceedings and evidence was heard. In our view the pending arbitration was not prohibited by the Act.[11]II.
 
 
 14
 Tamari also argues that estoppel should have barred CBOT from arbitrating the dispute because it vacillated over the meaning of the Section 7a(11) amendment to the Commodity Exchange Act. First CBOT, it is alleged, questioned its own jurisdiction and asked the parties for waivers which Tamari refused to provide. Then CBOT changed its opinion and decided to proceed with arbitration without waivers. In the meantime, Tamari filed the first of its suits, its alleged change of position. We see no merit in this contention. CBOT was not a party to the alleged agreement between the parties to arbitrate and did no more than by a legal opinion question for a short period of time its own jurisdiction under the recent amendment to the Act, a jurisdictional view which Tamari urges us to adopt. Tamari does not allege that CBOT acted fraudulently, with intended deception, or with culpable negligence. Crary v. Dye, 208 U.S. 515, 28 S.Ct. 360, 52 L.Ed. 595 (1907); California State Board of Equalization v. Coast Radio Products, 228 F.2d 520 (9th Cir. 1955). Tamari cites Dickerson v. Colgrove, 100 U.S. 578, 25 L.Ed. 618 (1880), to support its view, but that case also requires fraud or falsehood to justify estoppel. The good faith effort to interpret a new statutory amendment did not give rise to estoppel.
 
 III.
 
 15
 Next Tamari attacks the finding expressed in the preliminary opinion by the district court that a valid agreement to arbitrate existed. The district court may have taken into consideration the allegations and exhibits in defendant's Petition to Stay the Proceedings Pending the Completion of the Arbitration which set forth an alleged exchange of cables between the parties agreeing to arbitrate which was subsequent to the original agreement to arbitrate. The cables purport to show the further development and consummation of the agreement to arbitrate. In the face of Tamari's allegations that its appearance at the arbitration resulted from the defendant's fraud and coercion, and attacking the original total agreement for fraud, the validity of the arbitration process was not subject to final resolution merely on the record as it then stood. The finding of a valid arbitration agreement was error, but harmless and it does not necessarily control the appropriateness of the dismissal. Since this case was dismissed, the order to arbitrate was of no effect.
 
 
 16
 Tamari argues that the alleged fraud and coercion leading to its presence at arbitration was a question to be resolved by the courts and not by arbitration. The original arbitration clauses providing that any controversies arising were to be settled by arbitration were only parts of two total agreements relating to the accounts. Tamari does not allege specifically that it agreed to the arbitration clause due to fraud. Tamari specifically, however, alleges that Bache's misrepresentations that Bache was expert in handling commodity futures trading, analyzing the market and forecasting trends, induced Tamari to enter into the agreements which contained the arbitration clauses. In addition, Tamari generally alleges that the submission of its claim and its appearance at arbitration was due to fraud and coercion. In the complaint filed in the first Tamari suit (a copy of which was attached and incorporated as an exhibit in this second suit), Tamari asked the court to rescind all the agreements between the parties and to award Tamari compensatory and exemplary damages and fees and costs. Under broad arbitration agreements the issue of fraud generally in inducing the complete principal agreement is a suitable matter for arbitration. Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Hamilton Life Ins. Co. of New York v. Republic National Life Ins. Co., 408 F.2d 606 (2d Cir. 1969).
 
 
 17
 In Prima, the court adheres to the view that "except where the parties otherwise intend arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded, and where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." 388 U.S. at 402, 87 S.Ct. at 1805. The court notes that this view honors "the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts." Tamari does not allege that the arbitration clause was separate or that any legal issues which might arise were to be excluded from arbitration.
 
 
 18
 Tamari's alleged coerced appearance suggests some circumstances related to arbitration arising subsequent to the original agreements to arbitrate. Any such questions about the arbitration proceedings themselves are appropriate for the arbitration committee to consider and are in any event premature under the Arbitration Act. The district court could not find the arbitration agreement valid on the pleadings. That determination had to be left for arbitration of the total original contract, but it could take into consideration that the arbitration agreement itself had not been directly attacked in the complaint.
 
 IV.
 
 19
 Next Tamari complains that the district court violated due process by its sua sponte dismissal of the complaint without notice and hearing. There was adequate notice contained in the Preliminary Opinion of April 21, 1976, in which it was stated that in the court's view the case should be dismissed as to the parties before that court. On May 19, 1976, without anything further being heard from Tamari, it was dismissed. The procedure was not ideal, but it is sufficient to withstand Tamari's attack.
 
 V.
 
 20
 Tamari also argues that there was a conflict of interest within the CBOT which precluded fair arbitration. This arises from the alleged fact that Tamari itself had filed a complaint with another committee of CBOT charging Bache with violations of the Commodity Exchange Act and certain CBOT Rules and Regulations. Tamari then argues CBOT should not be both investigator and arbitrator. Part, at least, of any such alleged conflict was the result of Tamari's own action after the CBOT arbitration proceedings had been initiated. That complaint was filed with a separate committee, not the arbitration committee. We see no merit in this premature objection.
 
 VI.
 
 21
 Finally, Tamari argues that there was misconduct in the arbitration proceedings as the arbitration committee was drawn from an interest group to which Bache, not Tamari, belonged and that Bache was powerful and influential in that group. It was the district court's view that that type of complaint was reviewable only under Section 10 of the Federal Arbitration Act. We agree.
 
 VII.
 
 22
 The resolution of those particular issues framed by Tamari is sufficient to resolve the issue of dismissal. In addition, however, the dismissal may also be viewed as the exercise of the trial court's discretion in dismissing the one count complaint seeking declaratory relief. The question is not without some difficulty as the issues are clouded. With four separate federal cases and an arbitration proceeding growing out of the basic dispute, the litigation is fractured and in some disarray. It is not a good situation for the expeditious and efficient resolution of the underlying controversy. We attach no more significance to the district court's joint preliminary opinion so far as it may have applied to this case than to view it as showing in whole or in part what may have been considered by the court in the exercise of its discretion. To the extent that we can determine the basis of the trial court's ruling, we are bound to affirm even when that ruling may have been based upon an inappropriate ground or a wrong reason. Sapp v. Renfroe,511 F.2d 172 (5th Cir. 1975).
 
 
 23
 Certain considerations are readily apparent from Tamari's complaint. First, as Tamari alleges, the dispute between Tamari and Bache was docketed with the Arbitration Committee of CBOT on or about February 4, 1974. In that proceeding Tamari sought to recover $2,150,000 from Bache and Bache sought to recover $376,366.96 from Tamari. Tamari next filed with the Business Conduct Committee of CBOT a complaint against Bache alleging substantially the same losses. Tamari then filed its first suit on December 10, 1975, for the same $2,150,000 damages plus exemplary damages and costs. The CBOT Arbitration Committee, after consideration of jurisdictional problems, proceeded to take evidence on December 11, 1975. Then during the arbitration proceedings, on January 6, 1976, Tamari filed this second suit to halt the arbitration. Therefore, at that point Tamari was already engaged in three proceedings over the same dispute, one federal case (not counting the present suit), one arbitration proceeding and one other complaint with CBOT.
 
 
 24
 " The pendency of another action involving the same set of circumstances has often been of determinative importance in the exercise of judicial discretion." (6A Moore's Federal Practice P 57.08(6-1) (2nd ed. 1974)). That has been recognized as a decisive judicial discretion factor in this circuit even where the parties in the other pending action were not the same as the parties in the dismissed action. National Health Federation v. Weinberger, 518 F.2d 711 (7th Cir. 1975). See also Abbott Laboratories v. Gardner, 387 U.S. 136, 155, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Samuels v. Mackell, 401 U.S. 66, 70, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). We do not adhere to a chronological test rigidly applied, but it may be one of other factors affecting discretion. Chicago Furniture Forwarding Co. v. Bowles, 161 F.2d 411 (7th Cir. 1947). We are concerned with whether or not the declaratory relief sought "will more fully serve the needs and convenience of the parties and provide a comprehensive solution of the general conflict." (10 Wright & Miller, Federal Practice & Procedure § 2758 at 779 (1973)). In our view the declaratory relief sought could not meet that test. It could not provide a comprehensive solution of the underlying dispute nor any substantial part of it. The basic dispute would remain unresolved. Public Service Commission v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952). The court may also in the exercise of its discretion consider that "the wholesome purposes of declaratory acts would be aborted by its use as an instrument of procedural fencing either to secure delay or to choose a forum." American Automobile Ins. Co. v. Freundt, 103 F.2d 613, 617 (7th Cir. 1939). Further, the district court lacked authority to interfere with arbitration proceedings already in progress. The power of the district court to review arbitration proceedings is governed by Section 10 of the Federal Arbitration Act. The fourth suit filed by Tamari on January 27, 1977, in the district court and now pending, seeks to review and set aside that arbitration award. We do not favor a "piecemeal trial." TRW, Inc. v. Ellipse Corp., 495 F.2d 314 (7th Cir. 1974).
 
 
 25
 In reviewing the exercise of discretion by the district court, we adhere to the standard adopted in Beshear v. Weinzapfel, 474 F.2d 127, 134 (7th Cir. 1973).
 
 
 26
 Generally, an appellate court may set aside a trial court's exercise of discretion only if the exercise of such discretion could be said to be arbitrary. . . . (D)iscretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. (citations omitted)
 
 
 27
 In the particular circumstances of this case, we find no abuse of discretion under the applicable standard.
 
 
 28
 WE AFFIRM.
 
 
 29
 SWYGERT, Circuit Judge, dissenting.
 
 
 30
 I respectfully dissent. The crucial issue in this case is whether Tamari should be compelled to comply with the agreement to arbitrate disputes which was part of the contracts it signed upon opening two accounts with Bache. The contracts, one of which is reproduced below and on page 1205 of this opinion, were printed form documents which were obviously used by Bache for every account opened by a customer. The arbitration clause, which is paragraph 14 of the contract, was not the result of arm's length bargaining between Tamari and Bache. Rather, it is apparent that the arbitration clause was a mandatory feature of Bache's standard customer agreement, and that a customer could not purchase commodities futures through Bache unless he agreed to it.[1]
 
 
 31
 The issue of whether to enforce a contract of adhesion between parties of unequal bargaining power is a difficult one. See, e. g., Williams v. Walker-Thomas Furniture Co., 121 U.S.App.D.C. 315, 350 F.2d 445 (1965). I am convinced, however, that under the circumstances of this case the agreement to arbitrate should not be enforced.
 
 
 32
 The gravamen of Tamari's complaint is that Bache committed fraudulent acts which violated the Commodity Exchange Act. The antifraud provisions of the Act, 7 U.S.C. §§ 6b, 6o, are designed to protect individual investors in a complex area of the financial world where they easily can be cheated by sophisticated insiders. The legislative history of the most recent amendments to the Act makes clear that one of the Act's primary purposes is to protect the public:
 
 
 33
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLENOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 34
 The present Commodity Exchange Act is predicated upon findings and conclusions of the Congress that (1) transactions in commodity futures are carried on in large volume by the public, as well as by persons engaged in the business of buying and selling agricultural commodities in interstate commerce, and (2) such transactions and prices are susceptible to speculation, manipulation and control, and sudden and unreasonable price fluctuations, and such fluctuations are a burden upon interstate commerce and make regulation essential in the public interest. A fundamental purpose of the Commodity Exchange Act is to insure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers and the exchanges themselves. S.Rep. No. 93-1131, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News 5843, 5856.
 
 
 35
 Given the congressional mandate to protect the individual commodities investor, the courts should not permit the dismissal of complaints alleging fraud by a commodities broker on the basis of an adhesion contract drafted by that broker. We can be confident that, if the commodities brokers as a class can compel the arbitration of antifraud claims rather than litigating them in court, they will do so. The arbitrators before whom the complaints would be filed would also be insiders in the commodities industry, and would tend to be more tolerant of questionable practices by brokers than would a judge who is an outsider to the field. But the individual investor is entitled to have his claim decided by an outsider. It contravenes the spirit of the Act and undermines its remedial purposes to remand the investor who contends a broker has committed fraud to a committee composed of other brokers on the basis of an arbitration clause in an adhesion contract.
 
 
 36
 It was precisely this problem which motivated the Supreme Court's decision in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). The majority distinguishes Wilko because there is no analogue in the Commodity Exchange Act to section 14 of the Securities Act of 1933. But it is clear from the opinion in Wilko that a major underpinning of the Court's holding was also the vulnerability of an individual investor to being manipulated by insiders in the securities industry. 346 U.S. at 435, 74 S.Ct. 182.
 
 
 37
 Moreover, this court has recently extended the broad policy of investor protection contained in Wilko to a case in which section 14 of the Securities Act was not implicated. In Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 558 F.2d 831 (7th Cir. 1977), the issue was whether plaintiffs' claim that defendant violated Rule 10b-5 promulgated under the Securities Exchange Act of 1934 had to be dismissed because an agreement to arbitrate all disputes was contained in the adhesion contract which plaintiffs signed upon opening their account with defendant. We noted that Wilko was distinguishable because the private right of action under Rule 10b-5 was judicially created, while the private right of action under section 12(a) of the Securities Act is explicitly provided for by the statute. Therefore, the Securities Exchange Act lacks the "special right" which the Wilko Court held existed under the Securities Act and could not be waived under section 14 of that Act. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 513-14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).[2] Nonetheless, we refused to enforce the arbitration clause because it was not the product of actual bargaining between the parties and enforcement would undermine the policy contained in the Securities Exchange Act of protecting the individual investor who "is most vulnerable to securities swindles." 558 F.2d at 835.
 
 
 38
 Our conclusion in Weissbuch was previously reached by other courts which have considered the identical issue. Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 538 F.2d 532, 536 (3d Cir.), cert. denied, 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976); Macchiavelli v. Shearson, Hammill & Co., 384 F.Supp. 21, 27-28 (E.D.Cal.1974). In addition, Wilko has been extended to the antitrust area, in which no analogue to section 14 exists. Power Replacements, Inc. v. Air Preheater Co., 426 F.2d 980 (9th Cir. 1970).
 
 
 39
 In my judgment Weissbuch ought to control the case at bar. There is no logical way to distinguish the plight of the individual securities investor and the individual commodities investor. Both are vulnerable to fraudulent schemes perpetrated by industry insiders. Congressional concern for the individual investor is no greater in the Securities Exchange Act than it is in the Commodity Exchange Act. Finally, the danger that arbitration will frustrate the intent of Congress is no greater in the securities industry than it is in the commodities industry. I therefore agree with the court in Milani v. ContiCommodity Services, Inc., (1976) Commodity Futures L.Rep. (CCH) P 20,227 (N.D.Cal.1976), that enforcement of arbitration agreements such as the one in the case at bar would undermine the scheme of investor protection which Congress has enacted in the Commodity Exchange Act.
 
 
 40
 The Commodities Futures Trading Commission has recognized the unfairness of allowing brokers to utilize adhesion contracts to provide for compulsory arbitration of customer grievances. As early as 1975, the Commission issued an interpretative statement which discussed proposed amendments to the rules which the Commission is authorized to promulgate under the Act, and stated:
 
 
 41
 As already noted, one factor leading to passage of the CFTC Act was allegations made in court cases and newspaper articles that the arbitration procedures of contract markets had been unfairly applied. The Commission believes that the procedural protections contained in the amended proposed rules will prevent the possibility of abuses such as those alleged in the congressional hearings. The voluntary nature of procedures established by contract markets is a central part of this protection. A contract of adhesion, or an uninformed waiver of rights, is not a voluntary agreement, as customers may not be fully cognizant of the effects of an agreement to arbitrate until the claim or grievance arises. The amended proposed rule, therefore, provides that the parties' agreement to submit the claim or grievance to the procedure must have been made after the claim or grievance arose. (1976) Commodity Futures L.Rep. (CCH) P 20,111, at 20,805 (emphasis added).
 
 
 42
 The Commission has now established a rule which generally prohibits the arbitration of grievances unless the customer agrees to arbitrate after the time the grievance has arisen. 17 C.F.R. § 180.3(a).[3] The rule permits compulsory arbitration to be provided for in the initial contract between the broker and the customer only if: (1) agreeing to compulsory arbitration is not a prerequisite to using the broker's services; (2) the customer separately endorses the compulsory arbitration clause; (3) the contract contains boldface type warning the customer that he need not agree to compulsory arbitration of disputes in order to use the broker's services. 17 C.F.R. § 180.3(b).
 
 
 43
 If this rule were applicable to the case at bar, the district court's judgment would have to be reversed, because the compulsory arbitration clause contained in the contracts between Tamari and Bache does not satisfy the requirements of 17 C.F.R. § 180.3(b). Admittedly, the rule is inapplicable because, as finally amended, it did not become effective until January 18, 1977. But it strikes me as unfair to penalize Tamari simply because the rule was not yet in effect at the time Tamari entered its relationship with Bache. The principle underlying the rule is that it is always unfair for a broker to coerce a customer into agreeing to the compulsory arbitration of grievances through the use of adhesion contracts. That principle was as valid in 1972, when the contracts were signed, as it is now. It would in no way defeat Bache's legitimate expectations to refuse to enforce the arbitration clause. What the rule makes clear is that Bache never had a legitimate right to coerce its customers into agreeing to compulsory arbitration.
 
 
 44
 In my opinion, we should use our equitable powers to bridge the remedial gap which now exists for commodities transactions entered into before January 18, 1977. As I have already noted, I would refuse to enforce the compulsory arbitration clause even in the absence of a CFTC rule. Given the existence of the rule, I believe that the majority's disposition of this case also contravenes the well-established policy that we should defer to the expertise of the administrative agency to which Congress has entrusted the regulation of a particular field.
 
 
 45
 I therefore would reverse the district court's order dismissing this action. Unless Tamari agreed to arbitration after the time its dispute with Bache arose, it should be permitted to present its claims to the district court. As the majority correctly points out, however, whether Tamari did so is a disputed issue of fact which should not be decided on a motion to dismiss.
 
 
 
 *
 The Honorable A. Sherman Christensen, Senior District Judge of the United States District Court for the District of Utah, is sitting by designation
 
 
 [1]
 It may be helpful to identify the other cases. The first case was filed by Tamari on December 10, 1975, in the District Court for the Northern District of Illinois, seeking damages for fraud under the Commodity Exchange Act. The present or second suit in the same court followed on January 6, 1976, seeking to halt the arbitration proceedings. On May 19, 1976, the district court ruled in favor of defendants in both cases holding that there was an enforceable agreement to arbitrate under the Federal Arbitration Act, 9 U.S.C. §§ 3-4, and that Tamari was to proceed to arbitrate accordingly. Appeals followed. This court on September 23, 1976, dismissed the appeal in the first case, without prejudice to any further appeal from an appealable order. Tamari v. Bache & Co. (Lebanon) S.A.L., No. 76-1729 (7th Cir. Sept. 23, 1976). Prior to that decision, Tamari on June 6, 1976, filed its third action which was against the eight arbitrators named by the Chicago Board of Trade, who were then in the process of hearing the dispute between Tamari and Bache. Bache was permitted to intervene in that suit. The district court on November 15, 1976, dismissed that action, holding that Tamari had to proceed with the pending arbitration and exhaust all avenues of administration appeal before returning to the district court. This court affirmed. Tamari v. Conrad, 552 F.2d 778 (7th Cir. 1977). On January 27, 1977, at the conclusion of the arbitration the fourth suit was filed by Tamari against Bache, seeking to have the district court set aside the award of the panel of arbitrators adverse to Tamari, which was entered on June 21, 1976, and affirmed by the Appeals Committee of the CBOT on January 25, 1977. That case is still pending in the district court
 
 
 [2]
 The Federal Arbitration Act provides in pertinent parts as follows:
 Sec. 3. Stay of proceedings where issue therein referable to arbitration. If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which the suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.
 Sec. 4. Failure to arbitrate under agreement Petition to United States court having jurisdiction for order to compel arbitration Notice and service thereof Hearing and determination. A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure (Rules, part 1). The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure (Rules, part 1), or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.
 
 
 [3]
 The Commodity Exchange Act as amended by the Commodity Futures Trading Commission Act of 1974, provides in pertinent parts:
 7 U.S.C. § 7a(11)
 Each contract market shall
 (11) Provide a fair and equitable procedure through arbitration or otherwise for the settlement of customers' claims and grievances against any member or employee thereof; provided, that (i) the use of such procedure by a customer shall be voluntary, (ii) the procedure shall not be applicable to any claim in excess of $15,000, (iii) the procedure shall not result in any compulsory payment except as agreed upon between the parties, and (iv) the term 'customer' as used in this subsection shall not include a futures commission merchant or a floor broker . . . .
 7 U.S.C. § 4a, note
 Pending proceedings under existing law shall not be abated by reason of any provision of this Act but shall be disposed of pursuant to the applicable provisions of the Commodity Exchange Act, as amended, in effect prior to the effective date of this Act.
 
 
 [4]
 9 U.S.C. § 10 further provides in pertinent part:
 Vacation Grounds Rehearing.
 In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration
 (a) Where the award was procured by corruption, fraud, or undue means.
 (b) Where there was evident partiality or corruption in the arbitrators, or either of them.
 (c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
 (d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
 (e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
 
 
 [5]
 15 U.S.C. § 77n
 
 
 [6]
 This case is set for trial in the fall of 1977
 
 
 [7]
 Contract market is defined as an Exchange or Board of Trade where futures contracts are traded and so designated by the Secretary of Agriculture. A convenient glossary of terms used in commodity futures trading may be found at (1974) U.S.Code Cong. & Admin.News 5891-94
 
 
 [8]
 CFTC Interpretation, Comm.Fut.L.Rep. (CCH) P 6507, p. 6304, Question (5) (40 Fed.Reg.29121)
 
 
 [9]
 CFTC Interpretative Bulletin, July 2, 1975 (FR Doc. 75-17885, filed 7-9-75)
 
 
 [10]
 CFTC Letter No. 75-1; Comm.Fut.L.Rep. (CCH) P 20,088
 
 
 [11]
 The dissent states that Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith Inc. 558 F.2d 831 (7th Cir. 1977), ought to control this case. Weissbuch is also a securities case under the Securities Exchange Act of 1934 which contains a waiver provision. Weissbuch, however, in extending Wilko to 10b-5 situations under the 1934 Act does so only after noting the absence of international concerns which were the decisive factor in Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). In Scherk, the Supreme Court held that an international agreement containing an arbitration agreement was enforceable against a claim arising under Rule 10b-5 of the 1934 Act, declining to apply the Wilko rationale in such circumstance. The parties have not raised a similar international agreement issue, but it appears from the complaint the plaintiffs are residents of Lebanon and the defendants are corporations in the United States. It is further alleged that the transactions about which plaintiff complains were initiated in Lebanon and concluded in the United States. Thus, it appears following Scherk that the international aspects of the agreement and controversy further support the trial court's ruling
 
 
 [1]
 Even if the assumption that these were adhesion contracts were open to serious question, which I doubt, we must assume that the set of facts most favorable to Tamari is true because this case was decided on a motion to dismiss
 
 
 [2]
 The majority asserts that Scherk mandates enforcement of an arbitration agreement whenever "international concerns" are involved. This reading stretches Scherk well beyond the range of cases to which the Supreme Court intended it to apply. The holding of Scherk was that in a truly international contract, one "touching two or more countries, each with its own substantive laws and conflict-of-laws rules," the failure to enforce an arbitration agreement would unfairly exalt American law over those of other countries. 417 U.S. at 516, 94 S.Ct. at 2455. This case does not pose the problem of a conflict between American law and foreign law. The contract negotiated by Tamari and Bache involved purely American business dealings, and it is clear that the parties intended American law to govern any disagreement
 
 
 [3]
 17 C.F.R. § 180.3 provides, in relevant part:
 Voluntary Procedure and Compulsory Payments.
 (a) The use by customers of the dispute settlement procedures established by contract markets pursuant to the Act or this Part or of the arbitration or other dispute settlement procedures specified in an agreement under paragraph (b)(3) of this section shall be voluntary. The procedures so established shall prohibit any agreement or understanding pursuant to which customers of members of the contract market agree to submit claims or grievances for settlement under said procedures prior to the time when the claim or grievance arose, except in accordance with paragraph (b) of this section.
 (b) No futures commission merchant, floor broker or associated person shall enter into any agreement or understanding with a customer in which the customer agrees, prior to the time the claim or grievance arises, to submit such claim or grievance to any settlement procedure except as follows:
 (1) Signing the agreement must not be made a condition for the customer to utilize the services offered by the futures commission merchant, floor broker or associated person;
 (2) If the agreement is contained as a clause or clauses of a broader agreement, the customer must separately endorse the clause or clauses containing the cautionary language and other provisions specified in this section;
 (3) The agreement may not require the customer to waive the right to seek reparations under Section 14 of the Act and Part 12 of these regulations. Accordingly, the customer must be advised in writing that he or she may seek reparations under Section 14 of the Act by an election made within 45 days after the futures commission merchant, floor broker or associated person notifies the customer that arbitration will be demanded under the agreement. This notice must be given at the time when the futures commission merchant, floor broker or associated person notifies the customer of an intention to arbitrate. The customer must also be advised that if he or she seeks reparations under Section 14 of the Act and the Commission declines to institute reparation proceedings, the claim or grievance will be subject to the preexisting arbitration agreement and must also be advised that aspects of the claims or grievances that are not subject to the reparations procedure (i. e. do not constitute a violation of the Act or rules thereunder) may be required to be submitted to the arbitration or other dispute settlement procedure set forth in the preexisting arbitration agreement.
 (4) The customer agreement must contain cautionary language, printed in large boldface type, to the following effect:
 WHILE THE COMMODITY FUTURES TRADING COMMISSION (CFTC) RECOGNIZES THE BENEFITS OF SETTLING DISPUTES BY ARBITRATION, IT REQUIRES THAT YOUR CONSENT TO SUCH AN AGREEMENT BE VOLUNTARY. YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH (name). See 17 CFR 180.1-180.6.
 BY SIGNING THIS AGREEMENT, YOU MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW, BUT YOU ARE NOT WAIVING YOUR RIGHT TO ELECT AT A LATER DATE TO PROCEED PURSUANT TO SECTION 14 OF THE COMMODITY EXCHANGE ACT TO SEEK DAMAGES SUSTAINED AS A RESULT OF A VIOLATION OF THE ACT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF (name) INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND IF YOU PREFER TO REQUEST A SECTION 14 "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL STILL HAVE 45 DAYS IN WHICH TO MAKE THAT ELECTION.
 (5) If the agreement specifies a forum for settlement other than a procedure established pursuant to Section 5a(11) of the Act or this Part, the procedures of such forum must comply with the requirements of § 180.5 of this Part.