**B. DOE, M.D., on Behalf of B. DOE and B. Doe's patients, Plaintiff-Appellant,**

v.

**ST. JOSEPH'S HOSPITAL OF FORT WAYNE, et al., Defendants-Appellees.**

No. 85–1211.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1985.

Decided April 2, 1986.

---

Ivan E. Bodensteiner, Valparaiso, Ind., for plaintiff-appellant.

Patrick G. Michaels, Paul B. McNellis, Bonahoom Chapman, McNellis & Michaels, Ft. Wayne, Ind., for defendants-appellees.

Before CUDAHY and RIPPLE, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

The district court for the Northern District of Indiana dismissed appellant's amended complaint for failure to state a claim upon which relief could be granted. The complaint arose from the defendant hospital's revocation of her physician's staff privileges. We affirm in part and reverse and remand in part.

I.

The appellant, B. Doe, is a physician, licensed to practice in Indiana. She is engaged in general practice in Fort Wayne, Indiana. She was born in Korea and is a citizen of the United States. The appellees are St. Joseph's Hospital, located in Fort Wayne, its corporate owner, its board of directors, its administrator, the President of its Medical Staff and the members of its Executive Committee of the Medical Staff (the "Executive Committee").

In August 1982 St. Joseph's granted Doe associate staff privileges. She began to admit and care for patients there. In a letter dated January 26, 1983, the administrator of the hospital notified her that her staff privileges were summarily suspended. The letter stated that the hospital's administrator and the President of the Medical Staff had reviewed a formal complaint against Doe filed by another physician. The complaint dealt with an incident that involved her entering the room of another doctor's patient, "and in a loud, abusive manner, castigating [the other physician] in a most demeaning, unethical manner." The patient was scheduled for serious surgery the next day. The letter continued: "In view of the fact that I spoke to you personally last week regarding previous incidents of unprofessional behavior within the Hospital, this latest episode is especially incomprehensible." The plaintiff was permitted to complete the care and treatment of patients currently in the hospital. The letter advised her, however, "to stay completely away from [the patient whose room she had entered] or any member of her family."

Doe requested a meeting of the Executive Committee to discuss her summary suspension. The Executive Committee notified the plaintiff by letter dated February 10, 1983, that it had "[u]nanimously upheld [her] summary suspension without modification." The letter further advised her that she would have to complete physical, psychological and psychiatric examinations and successfully complete a "certified Physician Re-Training Program" before reapplying for privileges in the future. None of these are required by the hospital by-laws, nor are they uniformly required of physicians seeking staff privileges at the hospital.

She then sought review of her suspension by the Board of Directors, perhaps as early as March 15, 1983. In May 1983 she was orally advised by counsel for the hospital that the suspension would not be revoked.

Doe filed a complaint on June 21, 1983, alleging claims under 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the Sherman Act, 15 U.S.C. § 1, and state law. She amended her complaint on December 15, 1983, to add claims

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), and the Hill-Burton Act, 42 U.S.C. § 300s–6.[1] The plaintiff seeks declaratory and injunctive relief, damages and attorney's fees.

The defendants filed a motion for summary judgment on August 5, 1983, in which they argued that the due process clause of the fourteenth amendment did not apply because St. Joseph's is a private hospital. The district court did not rule on the motion. The defendants then filed a motion to dismiss for lack of subject matter jurisdiction on September 21, 1983. They argued that the court lacked subject matter jurisdiction because the plaintiff had failed to exhaust her administrative remedies.[2] The district court never addressed this issue. On December 20, 1983, the defendants moved to dismiss the Amended Complaint for failure to serve the Amended Complaint on either the defendants or their attorneys. This motion also was never ruled on by the district court.

After a number of settlement conferences and extensive negotiations between the parties, the district court dismissed the action *sua sponte*.[3] None of the issues involved in the *sua sponte* dismissal had been raised by the defendants. The trial court did not notify either side that it was considering these issues, nor did either side file any briefs in the district court addressing these issues.[4]

## II.

■ The issues on appeal are the sufficiency of the complaint and the propriety of the district court's *sua sponte* dismissal, without notice to the parties and without affording them an opportunity to be heard. We must take the allegations in the complaint to be true and view them, along with the reasonable inferences to be drawn from them, in the light most favorable to the plaintiffs. *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985); *Powe v. City of Chicago*, 664 F.2d 639, 642 (7th Cir.1981). A complaint should be dismissed for failure to state a claim only if it appears beyond doubt that the plaintiff is unable to prove any set of facts that would entitle the plaintiff to relief. *Ellsworth*, 774 F.2d at 184; *Benson v. Cady*, 761 F.2d 335, 338 (7th Cir.1985). A plaintiff need not set out in detail the facts upon which a claim is based, but must allege sufficient facts to outline the cause of action. *Ellsworth*, 774 F.2d at 184; *Benson*, 761 F.2d at 338.

■ *Sua sponte* dismissals for failure to state a claim upon which relief may be granted are permitted, so long as a sufficient basis for the court's action is apparent from the plaintiff's pleading. *See Flora v. Home Federal Savings & Loan Association*, 685 F.2d 209, 212 (7th Cir.1982); *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 565 F.2d 1194, 1198 (7th Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978); *see also Merrill Tenant Council v. United States Department of Housing & Urban Development (HUD)*, 638 F.2d 1086, 1094 (7th Cir.1981) (discussing *Tamari*, but not reaching the issue whether *sua sponte* dismissal without no-

1. The plaintiff does not appeal the dismissal of the Hill-Burton Act claim.

2. Doe apparently did not appeal the Executive Committee's recommendation within ten days as required by the hospital's by-laws. She claims, however, that the letter notifying her of the Executive Committee's recommendation failed to note the deadline for filing an appeal, and also failed to include a copy of the by-laws dealing with appeals, as required by the by-laws. Further, she argues that an appeal must be requested within ten days following the receipt of the recommendation, and that the letter of February 10, 1983, was not in the form of a recommendation. She also alleges that she sought review by the Board of Directors after the ten-day period and that counsel for the hospital later informed her orally that the summary suspension would not be revoked.

3. The district court's order incorrectly stated that the defendants had made a motion to dismiss for failure to state a claim upon which relief could be granted and that the plaintiff had responded to this motion.

4. As of the time of the dismissal of this action, Doe did not have full staff privileges at any of the hospitals in Fort Wayne. She did, however, have applications pending at two hospitals.

tice or an opportunity to be heard violates due process). The reason for this procedural approach is that the "proper administration of justice requires that a trial judge have substantial control over the proceedings before him." *Flora*, 685 F.2d at 212.

A judge acts not as a mere moderator, but as the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities inherent in the adversary process. *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976).

*Id.* (quoting *Caruth v. Pinkney*, 683 F.2d 1044 (7th Cir.1982), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983)).

*Sua sponte* dismissals without prior notice or an opportunity to be heard on the issues underlying the dismissal, however, "generally may be considered hazardous." *Tamari*, 565 F.2d at 1198. They may be criticized on several grounds. First, they conflict with traditional adversarial concepts of justice to the extent that they make the district court "a proponent rather than an independent entity." *Tingler v. Marshall*, 716 F.2d 1109, 1111 (6th Cir. 1983); *see Franklin v. Oregon*, 662 F.2d 1337, 1342 (9th Cir.1981). Second, such dismissals may ultimately waste, rather than economize, judicial resources, by producing appeals and remands that might have been avoided. *See Salibra v. Supreme Court of Ohio*, 730 F.2d 1059, 1062 (6th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984); *Tingler*, 716 F.2d at 1111; *Franklin*, 662 F.2d at 1342; *Lewis v. New York*, 547 F.2d 4 (2d Cir.1976). Third, *sua sponte* dismissals may prejudice plaintiffs by depriving them of an opportunity to amend their com-

plaints or to argue against the dismissal.[5] *Tingler*, 716 F.2d at 1111.

At least four circuits do not permit *sua sponte* dismissals without notice and an opportunity to be heard. *See Morrison v. Tomano*, 755 F.2d 515 (6th Cir.1985); *Salibra*, 730 F.2d 1059; *Jefferson Fourteenth Associates v. Wometco de Puerto Rico, Inc.*, 695 F.2d 524 (11th Cir.1983); *Franklin v. Oregon*, 662 F.2d 1337 (9th Cir.1981); *Pavilonis v. King*, 626 F.2d 1075, 1078 & n. 6 (1st Cir.), *cert. denied*, 449 U.S. 829, 101 S.Ct. 96, 66 L.Ed.2d 34 (1980); *Literature, Inc. v. Quinn*, 482 F.2d 372 (1st Cir.1973); *see also Tyler v. Mmes. Pasqua & Toloso*, 748 F.2d 283 (5th Cir.1984) (disapproving *sua sponte* dismissal prior to answer and noting that issue of failure to state a claim must be raised by defendant); *Leonhard v. United States*, 633 F.2d 599, 609 n. 11 (2d Cir.1980) (*sua sponte* dismissal on statute of limitations grounds permitted when answer pleaded statute of limitations and prayed for judgment dismissing the complaint), *cert. denied*, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981).

We cannot find a Seventh Circuit case in which a *sua sponte* dismissal without any notice and opportunity to be heard has been upheld. In *Flora* we held that "because both parties had an opportunity to be heard on the legal issue in the case ... the court's response was not undermined by the fact that it was made *sua sponte*." *Flora*, 685 F.2d at 212. In *Tamari* the district court had issued a preliminary opinion one month before ordering dismissal. *Tamari*, 565 F.2d at 1197. We interpreted the *sua sponte* dismissal "[a]gainst that background." *Id.* at 1198. Thus even in *Tamari* the parties had notice and adequate time to present their arguments to the judge or to amend the pleadings.

We need not answer the question whether a *sua sponte* dismissal without any notice and opportunity to be heard (in fact if not in form) is ever permissible, because in

5. In this case the opportunity to amend the complaint would have been especially valuable with respect to plaintiff's section 1981 claim. The case relied upon by the district court, *Anoo-*

*ya v. Hilton Hotels Corp.*, 733 F.2d 48 (7th Cir. 1984), was decided after the pleadings were filed in this case.

the case before us no sufficient basis for the dismissal is apparent from the pleadings.

### III.

■ The plaintiff alleges that the defendants acted in concert in an attempt to restrain trade and to exclude a competing provider of medical services from the market in violation of the federal antitrust laws. The district court correctly relied upon our decision in *Marrese v. Interqual, Inc.*, 748 F.2d 373 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985), to dismiss this claim.[6]

In *Marrese* we held that actions taken within the Indiana medical peer review process that result in the suspension of staff privileges are exempt from federal antitrust law under the state action doctrine. Plaintiff attempts to distinguish *Marrese* on the grounds that Marrese lost his staff privileges because of the quality of the care he provided to his patients, whereas Doe lost her privileges because of comments she made to another physician. We do not find the case before us to be distinguishable. Although all the facts are not before us at this stage of the proceedings, we think the circumstances of this case fall under the peer review process supervised by Indiana, even though they fall much more toward the fringes of the review process than the facts in *Marrese*.[7]

As the district court noted, it was the medical peer review process that resulted in the suspension of plaintiff's staff privileges.[8] Further, the Indiana medical peer review statute is not limited to the quality of care provided to patients:

The governing board of the hospital shall be the supreme authority in the hospital, responsible for the management, operation, functioning and control of the hospital, and the appointment of the members of the medical staff and the assignment of privileges to members of the medical staff with the advice and recommendations of the medical staff consistent with their individual training, experience and other qualifications. The medical staff of a hospital shall be an organized group which shall be responsible to the governing board ... and shall have the responsibility of reviewing the professional practices in the hospital for the purpose of reducing morbidity and mortality, and for the improvement of the care of patients in the hospital. *This review shall include, but shall not be limited to, the quality and necessity of the care provided patients....*

Ind.Code § 16–10–1–6.5 (1982) (emphasis supplied).[9]

6. We note that the Delaware district court has disagreed with our analysis in *Marrese. See Quinn v. Kent Gen. Hosp., Inc.*, 617 F.Supp. 1226, 1238–40 (D.Del.1985).

7. Plaintiff argues that even if Indiana "actively supervises" the medical peer process as it relates to quality of care, there is no reason to believe that Indiana "actively supervises" the medical peer review process as it relates to complaints unrelated to patient care. We see no reason why the state's active supervision of the peer review process, discussed thoroughly in *Marrese, see* 748 F.2d at 389–91, would not extend to this case.

Further, it is not clear from the record that the reasons for plaintiff's dismissal are entirely unrelated to the quality of patient care. The letter of suspension referred to "previous incidents of unprofessional behavior," which may be related to quality of care. Further, the specific incident complained of occurred in the presence of a patient who was facing serious surgery the next day. Doe's comments may

have upset the patient, and thus adversely affected the quality of care she received. Finally, we note that the Executive Committee required Doe to complete a certified Physician Re-training Program before reapplying for staff privileges. This is not required by the hospital by-laws. One may well infer from this requirement some concern with the quality of Doe's patient care.

8. Plaintiff also argues that *Marrese* should be distinguished because in that case the plaintiff alleged that the defendants were acting within the Indiana peer review process, whereas Doe has not made a similar allegation. We do not think that this omission should distinguish this case from *Marrese*, for such a distinction would exalt form over substance and permit counsel to evade *Marrese* merely by careful drafting of their pleadings.

9. The Indiana legislature amended § 16–10–1–6.5, effective April 22, 1983, to require that:

The governing board shall report, in writing, to the Indiana medical licensing board

■ In addition, we have doubts about whether or not plaintiff adequately alleged a nexus with interstate commerce.[10] In *Seglin v. Esau*, 769 F.2d 1274 (7th Cir. 1985), the plaintiff psychiatrist alleged that the suspension of his admitting privileges at defendant hospital violated the Sherman Act. We held that the "plaintiff must allege sufficient facts concerning the alleged violation and its likely effect on interstate commerce to support an inference that the defendants' activities infected by illegality either have had or can reasonably be expected to have a not insubstantial effect on commerce." *Id.* at 1280 (quoting *McLain v. Real Estate Board, Inc.*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980)). The plaintiff may not merely allege that some of defendants' activities affect interstate commerce. *Id.* Further, the plaintiff cannot allege bare legal conclusions without setting forth facts that at least outline a violation of the Sherman Act. *Id.* at 1279. We held that plaintiff's allegations that "the defendants provide psychiatric services to patients who travel in interstate commerce to receive such services, purchase equipment in interstate commerce, and receive insurance payments through interstate commerce," *id.* at 1279–80, were "insufficient to establish the required nexus with interstate commerce." *Id.* at 1280. We noted that if we did not affirm the dismissal "virtually every physician who is ever temporarily denied hospital privileges for whatever reason could drag the hospital and members of its staff into costly antitrust litigation merely by alleging that the defendant receives payments, goods, or equipment in interstate commerce." *Id.* at 1283–84.

■ Plaintiff in the case before us similarly has not alleged facts sufficient to establish the required nexus. She alleges:

The actions of the defendants have had a substantial effect on interstate commerce in that the practice of medicine in Fort Wayne involves: a) the purchase of drugs and medical supplies and equipment which travel in interstate commerce, b) the payment of medical bill [sic] through out-of-state private and governmental insurance programs, c) providing medical services to Ohio residents and, d) the general sharing of information and medical training across state lines.

Amended complaint at 5. The only difference between the allegations in *Seglin* and the allegations in the case before us is that Doe also alleges the sharing of information and medical training across state lines. We do not think that this additional factor provides a basis for the required nexus. Although it is possible that the plaintiff could amend her pleadings to pass muster under *Seglin,* we see no indication from the facts that she can do so. Hence we think the antitrust claim fails not only on *Marrese* grounds, but also on account of an inadequate allegation of effect on commerce.

## IV.

Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. This court has held that section 1981 applies only to allegations of discrimination based upon race and that "a

---

: the results and circumstances of any final, substantive, and adverse disciplinary action taken by the governing board regarding a physician on the medical staff, or an applicant for the medical staff, if the action results in voluntary or involuntary resignation, termination, nonappointment, revocation or sig-

nificant reduction of clinical privileges or staff membership.
Ind.Code § 16–10–1–6.5(b) (1983).

**10.** Antitrust claims like Doe's may border on the frivolous. *See Seglin v. Esau,* 769 F.2d 1274, 1279 n. 4 (7th Cir.1985).

claim of discrimination based solely on national origin fails to state a cause of action under section 1981." *Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 50 (7th Cir. 1984).

■ In the pleadings Doe alleged that she is Korean and expressly alleged the defendant had discriminated against her because of her race. The district court concluded that the plaintiff had alleged only national origin discrimination, and therefore dismissed the section 1981 claim on the authority of *Anooya.* We think this approach is erroneous, that the plaintiff has alleged racial discrimination and therefore her section 1981 claim was improperly dismissed.

*Anooya* is plainly distinguishable. In *Anooya,* the plaintiff claimed that he was "of Iraqi background" and that he was discriminatorily fired because of his national origin. We affirmed the district court's dismissal of his section 1981 claim. It was not reasonably inferable from the plaintiff's allegation that he was "of Iraqi background" that he belonged to a group distinct from the white race as a matter of race or color. *See Anooya,* 733 F.2d at 50 & n. 1, 51 (Cudahy, J., concurring). Unlike the situation of an Iraqi, it may be inferred from Doe's allegation that she is a Korean that she "belongs to a group that is distinct from 'white citizens' as a matter of race or color." *Anooya,* 733 F.2d at 50 (Cudahy, J., concurring) (footnote omitted). As the concurrence noted in *Anooya,* "allegations which raise inferences of some basis in race or color should be acceptable." *Id.* at 51. It is reasonably inferable from the claim that one is Korean that one is Oriental (or Asian). The Supreme Court has recognized that discrimination against Orientals is racial discrimination. *See Takahashi v. Fish & Game Commission,* 334 U.S. 410, 412, 420, 68 S.Ct. 1138, 1143, 92 L.Ed.2d 1478 (1948); *see also Korematsu v. United States,* 323 U.S. 214, 223, 65 S.Ct. 193, 197, 89 L.Ed. 194 (1944) (Japa-

nese plaintiff was "not excluded from the military area because of hostility to him or his race.").

Doe has adequately alleged racial discrimination under section 1981. Even if *Anooya* were read to require that the plaintiff expressly allege that she is an Oriental, we would still reverse. In that case the district court should have given the plaintiff an opportunity to amend her complaint, rather than dismissing *sua sponte.* Indeed this circumstance illustrates some of the hazards of *sua sponte* dismissals.

### V.

The appellant also argues that the district court improperly dismissed her claim under Title VI of the Civil Rights Act of 1964. The relevant part of Title VI provides:

No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Appellant alleged that the defendant hospital receives federal funds under various federal programs, including the Hill-Burton Act, 42 U.S.C. § 291 *et seq.,* which provides moneys for the construction of medical facilities. The district court held that the protection of Title VI extended only to intended beneficiaries of, applicants for, and participants in a federally funded program. Because there were no allegations in the complaint indicating that physicians were the intended beneficiaries of such programs, the district court dismissed the Title VI claim.

■ This court has held that in order to bring a private action under Title VI "the plaintiff must be the intended beneficiary of, an applicant for, or a participant in [11] a

---

11. Hereafter the entire class of intended beneficiaries, applicants and participants will be re-ferred to as "intended beneficiaries."

federally funded program." [12] *Simpson v. Reynolds Metal Co.,* 629 F.2d 1226, 1235 (7th Cir.1980) (footnote added); [13] *see Carmi v. Metropolitan St. Louis Sewer District,* 620 F.2d 672, 674 (8th Cir.1980); *NAACP v. Medical Center, Inc.,* 599 F.2d 1247, 1252 (3d Cir.1979); *Maloney v. Washington,* 584 F.Supp. 1263, 1266 (N.D.Ill. 1984); *Mosley v. Clarksville Memorial Hospital,* 574 F.Supp. 224, 236 (M.D.Tenn. 1983); *Vuciecevic v. MacNeal Memorial Hospital,* 572 F.Supp. 1424, 1430 (N.D.Ill. 1983) [14]; *Moxley v. Vernot,* 555 F.Supp. 554, 558 (S.D.Ohio 1982); *Ward v. Massachusetts Bay Transportation Authority,* 550 F.Supp. 1310, 1311 (D.Mass.1982); *Sabol v. Board of Education,* 510 F.Supp. 892, 895 (D.N.J.1981); *Flora v. Moore,* 461 F.Supp. 1104, 1115 (N.D.Miss.1978), *aff'd* 24 Empl.Prac.Dec. (CCH) ¶ 31,481 (5th Cir. 1980); *see also Chowdhury v. Reading Hospital & Medical Center,* 677 F.2d 317, 320 n. 9 (3d Cir.1982), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1411 (1983) (noting that other circuits require that private plaintiffs be intended beneficiaries); *Nodleman v. Aero Mexico,* 528 F.Supp. 475, 480–81 (C.D.Cal.1981) ("only plaintiffs who are 'of the class for whose especial benefit the statute was enacted' have standing to bring an action where a private remedy is implicit in a statute that does not expressly provide for one"). As we noted in *Simpson,* the legislative history of Title VI "lends strong support to the conclusion that Congress did not intend to extend protection under Title VI to any person other than an intended beneficiary of federal financial assistance." [15] *Simpson,* 629 F.2d

**12.** As the district court notes, this position is consistent with 42 U.S.C. § 2000d–3, which in effect is a specific application of the intended beneficiary rule to employment practices. Section 2000d–3 provides:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization *except where a primary objective of the Federal financial assistance is to provide employment.*

42 U.S.C. § 2000d–3 (emphasis supplied); *see* Section VI *infra* (discussing whether there is an "employment practice" for purposes of Title VII). When sections 2000d and 2000d–3 are read together, they require a "logical nexus between the use of federal funds and the practice toward which agency action is directed." *Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 276 (2d Cir.1981), *cert. denied, Bridgeport Firefighters for Merit Employment, Inc. v. Association Against Discrimination in Employment, Inc.,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982); *see Vuciecevic v. MacNeal Memorial Hospital,* 572 F.Supp. 1424, 1430 (N.D.Ill.1983). Although section 2000d–3 expressly addresses only agency action, courts have uniformly held that, even in private actions under Title VI, the primary objective of the federal grant must be to provide employment. *See, e.g., Association,* 647 F.2d at 276; *Trageser v. Libbie Rehabilitation Center,* 590 F.2d 87, 89 (4th Cir.1978), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979); *Mosley v. Clarksville Memorial Hosp.,* 574 F.Supp. 224, 236 (M.D.Tenn.1983).

**13.** *Simpson,* as well as several other of the cited cases, was brought under the Rehabilitation Act, not under Title VI. We commented upon the scope of Title VI because the relevant section of the Rehabilitation Act was modeled after, and intended by Congress to be enforced in the same manner as, Title VI. *See Simpson,* 629 F.2d at 1235.

**14.** *Vuciecevic* also involved a physician who had been denied hospital staff privileges. However, the only federal financial assistance in that case was medicare and medicaid.

**15.** *Simpson* explains:

> In response to concern voiced during debates on the Civil Rights Act of 1964 that Title VI would allow government intervention into every aspect of the operations of recipients of federal financial assistance, Representative Celler stated:
>
> This title simply provides that, where Federal money is used to support any program or activity ... the program must be used for the benefit of both races, without discrimination.
>
> \* \* \* \* \* \*
>
> The bill would require that each federal agency which extends financial assistance of the type covered by Title VI must establish nondiscriminatory standards of general application.
>
> ... It would, in short, assure the existing right to equal treatment in the enjoyment of federal funds.
>
> \* \* \* \* \* \*
>
> *as to each assisted program or activity, Title VI will require an identification of those persons whom Congress recorded as participants and beneficiaries and in respect to whom the principle declared in Title VI would apply.*
> 110 Cong.Rec. 1518–21 (emphasis supplied).

at 1235 (footnote omitted); *see Carmi*, 620 F.2d at 674 n. 4. The plaintiff does not allege that she is an intended beneficiary of any federally funded program in which the hospital participates; therefore we must affirm the dismissal of her Title VI claim.[16]

Doe argues that she does not have to be a direct beneficiary because the HHS regulations should be construed to grant her a private cause of action.[17] She contends that none of the cases cited above deal with the regulations, and therefore those cases can be distinguished. She does not, however, tell us why we should construe the regulations (which, of course, directly govern the disbursement of federal funds) to create private causes of action. It is not clear to us why these regulations, which are complex and ambiguous, necessarily reflect congressional intent with respect to private causes of action. We think that the principle articulated in the cases we have cited continues to apply here; plaintiff must be an intended beneficiary to bring a private action under Title VI. *Cf. Kelly v. Metropolitan Atlanta Rapid Transit Authority (MARTA)*, 30 Empl.Prac.Dec. (CCH) ¶ 33,066 (N.D.Ga.1982) (regulations under the Rehabilitation Act cannot create standing when the plaintiff lacks standing

---

See id. at 1542 (remarks of Rep. Lindsay); *Id.* at 1602 (remarks of Rep. Mathias); *Id.* at 2480–81 (remarks of Rep. Ryan); *Id.* at 6545 (remarks of Sen. Humphrey); *Id.* at 7060 (remarks of Sen. Pastore) and *Id.* at 13380 (letter from Deputy Atty. Gen. Nicholas DeB. Katzenbach to Rep. Celler).
*Simpson*, 629 F.2d at 1235 n. 17.

**16.** Doe argues that she was not able to determine whether she was an intended beneficiary because discovery was stayed. If on remand she believes that she can make this allegation, the district court should decide whether she should be allowed to amend her complaint.

**17.** The regulations to which plaintiff refers provide:

(b) *Specific discriminatory actions prohibited.* (1) A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin:

\* \* \* \* \* \*

(iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program;

(v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership or other requirement or condition which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program;

(vi) Deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program (including the opportunity to participate in the program as an employee but only to the extent set forth in paragraph (c) of this section).

\* \* \* \* \* \*

(c) *Employment practices.* (1) Where a primary objective of the Federal financial assistance to a program to which this regulation applies is to provide employment, a recipient may not (directly or through contractual arrangements) subject an individual to discrimination on the ground of race, color, or national origin in its employment practices under such program....
42 C.F.R. § 80.3. Section 80.4 sets forth the assurances that an applicant for federal financial assistance must make:

The assurance required with respect to [a] ... hospital, ... insofar as the assurance relates to the institution's practices with respect to admission or other treatment of individuals as ... patients ... of the institution or to the opportunity to participate in the provision of services or other benefits to such individuals, shall be applicable to the entire institution unless the applicant establishes, to the satisfaction of the responsible Department official, that the institution's practices in designated parts or programs of the institution will in no way affect its practices in the program of the institution for which Federal financial assistance is sought, or the beneficiaries of or participants in such programs. *If in any such case the assistance sought is for the construction of a facility or part of a facility, the assurance shall in any event extend to the entire facility and to facilities operated in connection therewith.*
45 C.F.R. § 80.4(d)(2) (emphasis supplied). Section 80.5 of the regulations provides some examples of the application of the regulations. It provides, in part:

In case of hospital construction grants the assurance will apply to patients, to interns, residents, student nurses, and other trainees, and to the *privilege of physicians*, dentists, and other professionally qualified persons *to practice in the hospital*, and will apply to the entire facility for which, or for a part of which, the grant is made, and to facilities operated in connection therewith.

because no primary objective of the federal financial assistance is to provide employment), *rev'd without opinion,* 698 F.2d 1236 (11th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984).

Plaintiff argues that, even if sections 80.4(d)(2) and 80.5(e) do not support her Title VI claim, section 80.3(c)(3) of the regulations supports her cause of action. Section 80.3(c)(3) provides:

> Where a primary objective of the Federal financial assistance is not to provide employment, but discrimination on the ground of race, color, or national origin in the employment practices of the recipient or other persons subject to the regulation tends, on the ground of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the foregoing provisions of this paragraph (c) shall apply to the employment practices of the recipient or other persons subject to the regulation, to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries.

45 C.F.R. § 80.3(c)(3). Plaintiff contends essentially that discrimination against doctors imports discrimination against their patients (presumably the primary beneficiaries here). In this connection, several courts have stated that a private cause of action lies if the alleged discrimination "necessarily causes discrimination against the primary beneficiaries of the federal aid." *Trageser,* 590 F.2d at 89 (footnote omitted); *see Simpson,* 629 F.2d at 1235 n. 16; *Mosley,* 574 F.Supp. at 236; *Murphy v. Middletown Enlarged City School District,* 525 F.Supp. 678, 708 (S.D.N.Y.1981);

*see also Caulfield v. Board of Education,* 583 F.2d 605, 610–11 (2d Cir.1978) (court approved government investigation of discrimination in the employment of teachers because discriminatory employment practices adversely affect minority children); *Sabol v. Board of Education,* 510 F.Supp. 892, 898–99 (D.N.J.1981) (restricting private cause of action under § 504 of Title V, which is analogous to Title VI, to situations in which broad policies of hiring are involved rather than single instances of employment discrimination).

■ We need not decide this issue of doctors' rights as representative of their patients because plaintiff's complaint does not adequately allege how the hospital's action could result in discrimination against patients on the grounds of race, color or national origin.[18] There are no allegations in her complaint about her patients' race, color or national origin. Further, the district court noted:

> There are no allegations in plaintiff's complaint that patients under her care cannot be admitted to St. Joseph's Hospital.... It is true that the patients could not be admitted with plaintiff listed as the treating physician because she does not have staff privileges. But, there is nothing in plaintiff's amended complaint which alleges that other physicians, possessing staff privileges, could not admit those patients for treatment at St. Joseph's Hospital....

District Court Order at 5–6.

Hence plaintiff's Title VI claim was properly dismissed.[19]

## VI.

■ Doe also argues that her claim under Title VII of the Civil Rights Act of 1964

---

45 C.F.R. § 80.5(e) (emphasis supplied).

**18.** We note that even if a private cause of action may arise under section 80.3(c)(3) of the regulations, plaintiff must establish that, under the general principles of third-party standing, she ought to be allowed to assert the rights of her patients. Plaintiff's complaint stated: "Because of the doctor/patient relationship and the obstacle to the patient raising their own rights (including their lack of resources and the uncertainty as to whether and when they might need

hospitalization), the plaintiff is asserting both her own rights and those of her patients." However, plaintiff did not argue on appeal why she should be allowed to assert the rights of her patients and it is far from certain that she should be able to do so in this case.

**19.** Plaintiff does not argue that she should be permitted to amend her complaint in order to state a claim under Title VI. We leave this question to the district court to resolve on remand, should the question arise.

was improperly dismissed by the district court. Title VII provides, in part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

42 U.S.C. § 2000e–2(a)(1). The district court held that one must be an "employee"[20] to state a claim for employment discrimination under Title VII. Because there was no employment relationship between the plaintiff and the hospital, the district court dismissed this claim.[21]

The appellant does not argue that she was an "employee" of the hospital. Rather, appellant argues that Title VII does not require an employment relationship between the plaintiff and defendant as a prerequisite to a claim under Title VII. Doe relies on *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973), and *Puntolillo v. New Hampshire Racing Commission*, 375 F.Supp. 1089 (D.N.H.1974). We think that plaintiff's reliance on these cases at least at the pleading stage—especially *Sibley*—is appropriate. Because she may have been able to establish that she was intended to be protected by Title VII, the district court should not have dismissed this claim at the pleading stage.

First, we note that the language of Title VII is broad. Section 2000e–2(a) does not use the term "employee" but rather refers to "any individual." *See Sibley*, 488 F.2d at 1341. There are no indications that "any individual" should be read to mean only an

employee of an employer.[22] *Id.* Hence, the argument that Doe is not an "employee" of the hospital, as defined by Title VII, is not dispositive. Further, Title VII prohibits discrimination not only with respect to conditions of employment, but also with respect to *"privileges of employment."* 42 U.S.C. § 2000e–2(a)(1) (emphasis supplied). The courts have held that Title VII should be construed "liberally so as to further the goals and purposes of eliminating discrimination in employment." *Unger v. Consolidated Foods Corp.*, 657 F.2d 909, 915 n. 8 (7th Cir.1981), *vacated on other grounds*, 456 U.S. 1002, 102 S.Ct. 2288, 73 L.Ed.2d 1297 (1982); *see, e.g., Martinez v. Orr*, 738 F.2d 1107, 1110 (10th Cir.1984); *Armbruster v. Quinn*, 711 F.2d 1332, 1336 (6th Cir.1983); *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 391 (8th Cir.1977).

In *Sibley* the plaintiff was a male private duty nurse who worked in a private hospital for patients who required a private nurse. When a patient needed a private nurse the hospital's nursing office would communicate the request to a registry. Neither the hospital nor the registry was permitted to discriminate on the basis of sex. The registry would match the patient with an available nurse, and the nurse would report to the patient. If the nurse was unacceptable to the patient, for any reason, the patient would still be required to pay the nurse one day's wages. The plaintiff complained that supervisory nurses at the defendant hospital had themselves rejected him and prevented him from reporting to the patient when the patient was female.

The court in *Sibley* held that the plaintiff had a Title VII claim, despite the absence of an employment relationship between the nurse and the hospital. The court first noted that in Title VII Congress had in-

**20.** Title VII defines "employee" as "an individual employed by an employer," with certain exceptions. 42 U.S.C. § 2000e(f).

**21.** The appellant had filed a timely charge with the Equal Employment Opportunity Commission and received a "Notice of Right to Sue."

**22.** Further, "[t]he Act, in providing for the filing of complaints with EEOC and of eventual actions in the District Court, does not use the term

'employee.' The phrase is, rather, the 'person aggrieved;' and that term can certainly be taken as comprehending individuals who do not stand in a direct employment relationship with an employer.... It seems unlikely that Congress would confer standing to bring a suit under the Act upon persons without rights under the Act because they are not employees." *Sibley*, 488 F.2d at 1341.

tended to "achieve *equality of employment opportunities,*" and to "provide equal access to the job market for both men and women." *Sibley,* 488 F.2d at 1340–41 (emphasis in original) (quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158 (1971) and *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385, 386 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971), respectively).

> Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone the continued use of the very criteria for employment that Congress has prohibited.

*Sibley,* 488 F.2d at 1341.

In *Puntolillo* the plaintiff, a driver-trainer of harness horses, sued the New Hampshire Racing Commission under Title VII for denying him a necessary license to race, and the New Hampshire Trotting and Breeding Association for denying him stall space at the race park. The plaintiff was employed by the horse owners, not by either of the defendants. The court, following *Sibley,* denied the defendants' motion to dismiss for failure to state a claim upon which relief could be granted.

The courts' reasoning seems to apply to the case before us. Plaintiff alleges that the hospital's action has interfered with her employment opportunities.[23] Congress presumably did not intend to allow the hospital to exploit its power to grant and deny staff privileges in order to discriminatorily interfere with Doe's employment opportunities with her patients.

Appellees assert that *Sibley* should be distinguished because there the hospital could entirely foreclose the nurse's access to patients, while in the case before us St. Joseph's has no such control over the physician's access to her patients.[24] Similarly, the dissent argues that in *Sibley* the "hospital's control over the employees at issue was, as a practical matter, absolute." Slip op. at 427. But the hospital in *Sibley* could only foreclose the nurse's access to patients in that hospital. The nurse's employment opportunities outside of that hos-

---

**23.** Doe alleged that she "has suffered damage to her profession, her medical practice, her reputation and has been subjected to mental distress and suffering. She is suffering irreparable harm in that her medical practice is being irreparably damaged by her ability to care for patients in a hospital, thereby requiring patients and potential patients to seek medical care elsewhere."

**24.** Appellees also assert that *Sibley* should be distinguished because the plaintiff in *Sibley* was an employee of the hospital. Appellees' Brief at 13. We have been unable to find support in the case for this assertion. Indeed, the court said that "there seems to be no question that appellant and appellee did not contemplate any immediate or future relationship of direct employment in the sense of the usual indicia of such employment." *Sibley,* 488 F.2d at 1342; *see Martin v. Delaware Law School of Widener Univ.,* 625 F.Supp. 1288 (D.Del.1985) ("The hospital [in *Sibley*] did not actually employ the nurses.").

Appellees would also distinguish *Sibley* because in that case the hospital maintained the character of an employment agency. Once again, counsel misunderstands *Sibley.* The hospital did not discriminate in referring patients' offers of employment to nurses. Rather, the hospital discriminated by not permitting the referred nurse access to the patient. When the hospital denied the plaintiff access it was not acting in its role as "employment agency." The court in *Sibley* held that the hospital was similar to labor unions and employment agencies because it had a "highly visible nexus with the creation and continuance of direct employment relationships between third parties." *Id.* We think that Doe should be allowed to show both on summary judgment and, if appropriate, at trial that St. Joseph's has such a nexus.

pital, for example at other private hospitals, apparently remained unimpaired. *See Shehadeh v. Chesapeake & Potomac Telephone Co.,* 595 F.2d 711, 722 (D.C.Cir. 1978). Hence *Sibley* cannot be distinguished by merely pointing out that Doe may treat her patients in her office or in another hospital.

Similarly, appellees would distinguish *Puntolillo* because the plaintiff could not race at all without a license. We disagree. A defendant does not have to foreclose all employment opportunities in order to unlawfully interfere with these opportunities.[25]

Further, other circuits have held that an "employer," for purposes of a Title VII claim, may be "any party who significantly affects access of any individual to employment opportunities, regardless whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." *Spirt v. Teachers Insurance & Annuity Association,* 691 F.2d 1054, 1063 (2d Cir.1982) (quoting *Vanguard Justice Society, Inc. v. Hughes,* 471 F.Supp. 670, 696 (D.Md.1979)), *vacated on other grounds,* 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983); *see, e.g., Gomez v. Alexian Brothers Hospital,* 698 F.2d 1019, 1021 (9th Cir.1983); *Livingston v. Ewing,* 601 F.2d 1110, 1114 (10th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 147, 62 L.Ed.2d 95 (1979).

The dissent relies upon *Beverley v. Douglas,* 591 F.Supp. 1321, 1328 (S.D.N.Y. 1984), for the proposition that, even under the *Sibley* analysis, Doe cannot invoke Title VII because she does not have an employment relationship with her patients. In *Beverley* the plaintiff, a physician, was denied voluntary admitting privileges at the defendant hospital. The district court granted the defendant's motion for summary judgment on all claims, including a Title VII claim. The court rejected the plaintiff's argument that she could make a Title VII claim under the *Sibley* analysis. The court reasoned that the hospital must interfere with the physician's employment relationship. Because the plaintiff in *Beverley* admitted that her relationship to her patients was not that of employer and employee, but rather was that of an independent contractor, the plaintiff could not bring her Title VII claim.

We note, however, that at least one district court has denied a motion to dismiss a Title VII claim involving similar allegations. *See Pao v. Holy Redeemer Hospital,* 547 F.Supp. 484 (E.D.Penn.1982). In that case the plaintiff, an opthalmologist of Chinese ancestry, alleged that the defendant had impaired his ability to practice by repeatedly denying him staff privileges,[26] even though he had staff privileges at other hospitals.[27] The court held that the case fell within *Sibley. See Pao,* 547 F.Supp. at 494.

In the present case, it appears that if the allegations contained in the amended complaint are true, the defendants' discriminatory conduct will have deprived

---

**25.** For example, in *Gomez v. Alexian Bros. Hosp.,* 698 F.2d 1019 (9th Cir.1983), the plaintiff was a Hispanic physician who practiced medicine as an employee of the professional corporation AES. Plaintiff alleged a Title VII violation when the contract proposal that AES submitted to the hospital for the operation of the emergency room was rejected, allegedly because many of AES' employees were Hispanic. Under the proposal the plaintiff was to serve as the director of the hospital's emergency room. The district court granted summary judgment for the defendants because there was no present or potential employment relationship between plaintiff and defendant; the plaintiff would in any case remain an employee of AES. The Ninth Circuit reversed, holding that "[t]he fact that plaintiff continues as an employee of AES

does not mean the employment relationship between AES and plaintiff has not been interfered with. The conditions of plaintiff's employment are different than they would have been had he not been discriminated against." *Id.* at 1021.

**26.** The plaintiff alleged that his practice was injured because the defendant hospital was the most convenient, had special equipment and because he had lost patients because he did not have staff privileges there.

**27.** The court held that whether or not the plaintiff had access to other hospital facilities was not relevant to Title VII. *Pao,* 547 F.Supp. at 494.

the plaintiff of prospective patients desiring the convenience and resources of Holy Redeemer Hospital's retinal facilities. Thus, Holy Redeemer Hospital had the same capacity as the defendant in *Sibley* to control the plaintiff's access to those *prospective patients who are his ultimate "employers."*

*Id.* (footnote omitted) (emphasis supplied). Thus *Pao* implicitly holds that a physician may have an employment relationship with her patients sufficient to bring a Title VII claim under the *Sibley* analysis.[28]

Further, it may be difficult to distinguish the employment relationship between a nurse and his patients, which was evidently sufficient to sustain a Title VII claim in *Sibley,* and the employment relationship between a physician and her patients. As one court has noted, "[a]rguably, a male nurse who works on a day-to-day basis or a driver-trainer who works for a horse owner is an independent contractor." *Smith v. Dutra Trucking Co.,* 410 F.Supp. 513, 518 n. 11 (N.D.Cal.1976), *aff'd mem.,* 580 F.2d 1054 (9th Cir.1978).

Thus it is far from certain that the doctor-patient relationship would not be protected under a *Sibley* analysis. There is substantial uncertainty about the type of employment relationship that is protected by such an analysis. Because of this uncertainty, it is premature to dismiss plaintiff's Title VII claim at the pleading stage. The only case we have found that considers a claim for denial of a physician's staff privileges under Title VII at the pleading stage is *Pao v. Holy Redeemer Hospital, supra,* which sustains the claims. Thus, appellant should be allowed to make a showing that defendant has discriminatorily interfered with her employment opportunities in such a way as would fit clearly into the *Sibley* analysis. We express no view at this stage on the prospects of making such a showing.

## VII.

■ The defendants alternatively argue that we should affirm the district court's dismissal on the grounds that federal jurisdiction is lacking because the plaintiff failed to exhaust her administrative remedies. The defendants, however, fail to cite any cases in support of this argument that involve claims under section 1981, Title VI or Title VII.[29] It appears that exhaustion of remedies does not apply to claims under any of the civil rights acts.[30] *See Donaldson v. Taylor Products Division of Tecumseh Products Co.,* 620 F.2d 155, 158 (7th Cir.1980); *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309, 1316 (7th Cir.1974), *cert.*

---

**28.** In *Pao* the court placed the word "employers" within quotation marks, thus indicating that a common law employment relationship is not required between the physician and her patients. Indeed we note that the common law independent contractor/employee test is often not applied to antidiscrimination legislation, because "it is considered inconsistent with the remedial purposes behind such legislation." *Mares v. Marsh,* 777 F.2d 1066, 1067 n. 1 (5th Cir.1985) (citing cases). Instead, other, less restrictive tests such as the "economic realities" test or a hybrid of that test are used. *See id.* (citing cases using these other tests); *see also EEOC v. Dowd & Dowd, Ltd.,* 736 F.2d 1177 (7th Cir.1984) (recognizing the "economic realities" test).

We note that a later case involving a motion for summary judgment and decided in the Eastern District of Pennsylvania, *Amro v. St. Luke's Hosp.,* 39 Fair Empl.Prac.Cas. (BNA) 1574 (E.D. Penn.1986), apparently disagreed, on the basis of the "hybrid" test, with the conclusion in *Pao.* The court in *Amro,* however, based its decision upon the relationship between the physician and the hospital. *Amro* does not discuss what relationship was required between the physician and her patients. The court assumed that there must be an employment relationship between the physician and the hospital without even discussing *Sibley.* The *Amro* court held that under the "hybrid" test there was no employment relationship between the physician and the hospital and thus the physician could not bring a Title VII action.

**29.** Further, the issue of exhaustion of administrative remedies raises certain factual issues that we cannot properly decide. *See supra* note 2.

**30.** We recognize, of course, that a charge must be filed with the Equal Employment Opportunity Commission before proceeding in court under Title VII. Plaintiff filed a timely charge with the EEOC and received a "Notice of Right to Sue" dated September 30, 1983.

*denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

Under Title VII, contractual administrative remedies do not have to be exhausted in order to bring a judicial action.[31] *See Donaldson,* 620 F.2d at 158; *Sprogis v. United Air Lines,* 517 F.2d 387, 390 (7th Cir.1975) (plaintiff may forego settlement agreement between her bargaining representative and her former employer to file Title VII action); *Waters,* 502 F.2d at 1316; *see also Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 49, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147 (1974) (individual does not forfeit his private cause of action under Title VII if he first pursues his grievance to final arbitration under a collective-bargaining agreement).

With respect to Title VI, the Supreme Court has refused to impose an exhaustion requirement under Title IX of the Education Amendments of 1972, which is analogous to Title VI. *See Cannon v. University of Chicago,* 441 U.S. 677, 706–08 n. 41, 99 S.Ct. 1946, 1962–64 n. 41, 60 L.Ed.2d 560 (1979). The lower courts have also rejected an exhaustion requirement for Title VI cases. *See Chowdhury v. Reading Hospital & Medical Center,* 677 F.2d 317 (3d Cir.1982) (physician alleging that denial of staff privileges at hospital was racially discriminatory is not required to exhaust administrative remedies under Title VI), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1411 (1983).

In *Donaldson* and *Waters,* we held that section 1981 did not require exhaustion of remedies. *See Donaldson,* 620 F.2d at 158; *Waters,* 502 F.2d at 1316.

### VIII.

We affirm the judgment with respect to the dismissal of plaintiff's Sherman Act and Title VI claims, and reverse and remand with respect to the dismissal of the section 1981 and Title VII claims for further proceedings not inconsistent with this

opinion. Because we have reversed the district court's dismissal of several of plaintiff's federal claims, we must also reverse the dismissal of plaintiff's state claims and these claims are remanded to the district court for further proceedings. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Circuit Rule 18 shall apply.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's disposition of the section 1981, Title VI and antitrust claims. I respectfully disagree, however, with its disposition of the Title VII claim.

The majority, adopting a broad interpretation of Title VII, holds that the district court's dismissal of Dr. Doe's Title VII claim for failure to state a claim upon which relief could be granted was inappropriate. I respectfully disagree.

Title VII states, in pertinent part, that:
(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1). According to the Act, an employee is "an individual employed by an employer." *Id.* § 2000e(f). Dr. Doe does not dispute the fact that she did not have an employment relationship with St. Joseph's for purposes of Title VII. Rather, she contends that the hospital's action in denying her "staff privileges" interfered with her employment opportunities:

---

31. We note that appellees concede that the by-laws of St. Joseph Hospital, under which they claim plaintiff should have pursued her administrative remedies, are considered a contract between the hospital and the physician granted staff privileges. *See* Appellees' Brief at 21 (citing authority).

A discriminatory denial of staff privileges to a physician adversely affects her ability to obtain and maintain employment by patients who need hospitalization. The plaintiff specifically alleges, in paragraphs 16 and 27 of her Amended Complaint, A–19, that her inability to admit and care for patients in the defendant hospital, has "significantly and adversely affected her employment relations and opportunities with patients," and has required that her patients and potential patients seek medical care elsewhere.

Appellant's Br. 23–24.

The majority finds that Dr. Doe's reliance on *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973), and *Puntolillo v. New Hampshire Racing Commission*, 375 F.Supp. 1089 (D.N.H.1974) is appropriate. I agree that those cases provide support for the proposition that Title VII was intended to "achieve *equality of employment opportunities*," and to "provide equal access to the job market for both men and women." *Sibley*, 488 F.2d at 1340–41 (emphasis in original) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158 (1971) and *Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385, 386 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971), respectively). However, I do not believe that those cases provide support for Dr. Doe's claim. There is a vital distinction between the *Sibley* and *Puntolillo* holdings and this case—the *degree* of control exercised by the defendant over the plaintiff's access to employment opportunities. In *Sibley*, the action of the hospital prevented Wilson from making the contact necessary to establish an employment relationship between himself and his "employers"—the patients. The hospital's control over access to the "employers" at issue was, as a practical matter, absolute. Similarly, in *Puntolillo*, the action of the Commissioner effectively precluded Puntolillo from establishing an employment relationship with horse owners—his potential "employers." In both cases, the defendants had total effective control over the plaintiffs' abilities to contact their actual "employers."

In this case, however, St. Joseph's Hospital does not have such total control over Dr. Doe's ability to obtain patients. It cannot prevent or preclude her from maintaining or establishing relationships with patients.[1] Her "staff privileges" at St. Joseph's simply afforded her an opportunity to treat her patients in that particular hospital. Dr. Doe is still free to treat her patients at her office or in any other health facility. In short, since St. Joseph's Hospital does not control Dr. Doe's access to patients, its action cannot be characterized as interfering with her employment relationships with her patients.[2]

The specific question of whether Title VII affords protection to physicians who are affiliated with hospitals has been considered by three courts. Those courts reached different results. As the majority notes, one district court concluded that the denial of staff privileges falls within the

---

**1.** Dr. Doe alleged in her complaint that she has applied for "staff privileges" at other Ft. Wayne hospitals but that she had not as yet been granted those privileges. However, the fact that no other hospital has accorded her privileges does not require St. Joseph's to keep her on staff.

**2.** This analysis applies with equal force to *Gomez v. Alexian Bros. Hosp.*, 698 F.2d 1019 (9th Cir.1983). In *Gomez*, the plaintiff was a Hispanic physician who practiced medicine as a professional corporation under the name American Emergency Services Professional Corporation Medical Group (AES). In 1978, AES submitted a bid to run the defendant's emergency room. Plaintiff was to act as director of the emergency room, and five of the twelve participating physicians were to be Hispanic. The hospital rejected the bid. The court found that Dr. Gomez stated a cause of action under Title VII because he alleged that the hospital's refusal, purportedly on racial grounds, "denied him the opportunity to be employed by AES as director of defendant's emergency room." *Id.* at 1021.

The employment opportunity sought by Gomez was to handle emergency patient care on a full-time basis. Patients in need of such emergency care seek it from health care facilities not individual physicians. By refusing the AES bid, the hospital effectively precluded Gomez from any access to emergency medical patients. Again, Dr. Doe has not been so hampered.

*Sibley* rule. *See Pao v. Holy Redeemer Hospital,* 547 F.Supp. 484 (E.D.Pa.1982). The *Pao* court decided that the hospital had the "same capacity as the defendant in *Sibley* to control the plaintiff's access to those prospective patients who are his ultimate 'employers.'" *Pao,* 547 F.Supp. at 494. The court, therefore, refused to grant the defendant's motion to dismiss. I believe that this decision was incorrect.[3] In my view, a recent case, *Beverley v. Douglas,* 591 F.Supp. 1321, 1328 (S.D.N.Y.1984), presents a rationale far more compatible with congressional intent. In *Beverley,* the district court considered the question whether the denial of admitting privileges at a hospital presented an employment relationship within the meaning of Title VII. After rejecting the argument that the physician had an employer-employee relationship with the hospital, *id.* at 1327, it addressed the argument that denial of hospital privileges interferes with the physician's future employment opportunities with his or her patients. After distinguishing *Sibley* and *Gomez* along the lines suggested in the foregoing paragraphs, Judge Weinfeld concluded:

> Even assuming that plaintiff has alleged that the Hospital's denial of her application for voluntary attending privileges interfered with her relationship to her patients, her relationship to her patients is not one of employment. Indeed, plaintiff admits that "there is no question that a 'physician, in his or her relationship with patients, is the classic independent contractor.'" In order to invoke Title VII, plaintiff must allege and prove some link between the defendants' actions and an employment relationship. No such connection is present here—by plaintiff's own admission, her relationship to her patients is not that of employer and employee.

*Id.* at 1328.

The analysis employed by Judge Weinfeld in *Beverley* is the correct one. Dr.

Doe has not established the connection between herself and the hospital necessary to state a claim under Title VII—an employment relationship with which there has been interference. Physicians with "staff privileges" such as Dr. Doe are independent contractors. Moreover, physicians are not considered to have an employment relationship with their patients. Rather, it is a client/professional relationship—much like that between an attorney and his client. Thus, under any reading of Dr. Doe's claim, she does not state a cause of action under Title VII, and the district court's dismissal of her claim should be affirmed.

---

**3.** A subsequent decision from the same district has substantially undercut the rationale of *Pao.* In *Amro v. St. Luke's Hosp.,* 39 Fair Empl.Prac. Cas. (BNA) 1574 (E.D.Pa.1986), the court held that "[e]ven though the defendant hospital may exercise economic control over the plaintiff's future to earn income, this is not sufficient to counterbalance all the other factors which tend to classify the doctor as an independent contractor." *Id.* at 1577.